**No. 24-3659**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

TOHONO O'ODHAM NATION, ET AL.,
Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF THE INTERIOR, ET AL.,
Defendants-Appellees,

and

SUNZIA TRANSMISSION, LLC,
Intervenor-Appellee

---

Appeal from the United States District Court for the District of Arizona
Honorable Jennifer G. Zipps (No. 4:24-cv-00034-JGZ)

---

# PLAINTIFFS' OPENING BRIEF

---

Howard Shanker, Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
(520) 383-3410

Alexander B. Ritchie, Attorney General
Bernardo M. Velasco, Asst. Attorney General
SAN CARLOS APACHE TRIBE
P.O. Box 40
San Carlos, AZ 85550
alex.ritchie@scat-nsn.gov
bern.velasco@scat-nsn.gov
(928) 475-3344

William S. Eubanks II
Elizabeth L. Lewis
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
bill@eubankslegal.com
lizzie@eubankslegal.com
(202) 618-1007

*Counsel for Center for Biological Diversity and Archaeology Southwest*

*Counsel for Plaintiffs-Appellants*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Center for Biological Diversity and Archaeology Southwest state that they are 501(c)(3) non-profit organizations with no parent corporations or any publicly-held corporations that own 10% or more of their stock. Plaintiffs Tohono O'odham Nation and the San Carlos Apache Tribe are sovereign Nations.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........ ii

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ v

LIST OF ACRONYMS AND ABBREVIATIONS ........ x

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 5

STATEMENT OF ISSUES ........ 5

STATEMENT OF THE CASE ........ 6

I. LEGAL BACKGROUND ........ 6

II. FACTUAL BACKGROUND ........ 10

III. PROCEEDINGS BELOW ........ 13

STANDARD OF REVIEW ........ 14

SUMMARY OF ARGUMENT ........ 15

ARGUMENT ........ 17

I. DISMISSAL IS INAPPROPRIATE ........ 18

II. CONTROLLING AUTHORITY COMPELS THE CONCLUSION THAT PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED ........ 22

III. PLAINTIFFS TIMELY CHALLENGED THE FINAL AGENCY ACTIONS (THE LNTPs) THAT CONSUMMATED BLM'S NHPA DECISIONMAKING PROCESS ........ 26

A. The NHPA Applies To All Stages Of The Project ........ 28

B. The ROD Was Not BLM's Final Decision Under The NHPA ........ 30

C. The LNTPs Constitute Final Agency Action For BLM's Decisionmaking Process Under The NHPA ........ 34

D. The District Court's Ruling That Plaintiffs' Claims Are Untimely Is Contrary To Circuit Precedent ........ 39

IV. PLAINTIFFS' COMPLAINT PLAUSIBLY ALLEGES BLM FAILED TO ABIDE BY THE TERMS OF THE PA ........ 43

CONCLUSION ........ 48

CERTIFICATE OF COMPLIANCE ........ 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acri v. Int'l Ass'n of Machinists & Aerospace Workers*,
781 F.2d 1393 (9th Cir. 1986) .......... 23

*Acuna v. USDA*,
No. CV-16-00271, 2017 WL 11696487 (D. Ariz. Sept. 14, 2017) .......... 29, 33

*All. for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) .......... 43

*Ariz. All. for Cmty. Health Ctrs. v. Ariz. Health Care Cost Containment Sys.*,
47 F. 4th 992 (9th Cir. 2022) .......... 14, 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 15, 43, 44

*B&L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) .......... 20, 43

*Bell A. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 15, 20

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 30, 31, 32, 33, 34, 36, 38

*Cal. Sea Urchin Comm'n v. Bean*,
828 F.3d 1046 (9th Cir. 2016) .......... 40, 41, 42

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
603 U.S. ___, 144 S. Ct. 2440 (2024) .......... 2, 5, 15, 16, 17, 18, 22, 23, 25

*Ctr. for Biological Diversity v. U.S. EPA*,
847 F.3d 1075 (9th Cir. 2017) .......... 42

*Darby v. Cisneros*,
509 U.S. 137 (1993) .......... 40

*Edwards v. Marin Park, Inc.*,
356 F.3d 1058 (9th Cir. 2004) .......... 15

*Hammond v Norton*,
370 F. Supp. 2d 226 (D.D.C. 2005) ........................................ 38

*Harrosh v. Tahoe Reg'l Plan. Agency*,
640 F. Supp. 3d 962 (E.D. Cal. 2022) ........................................ 30, 34

*Khoja v. Orexigen Theraputics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........................................ 11, 21

*Lau v. FBI*,
No. 23-cv-00329, 2024 WL 624023 (D. Haw. Feb. 14, 2024) ........................................ 20

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) ........................................ 22

*Mansor v. U.S. Citizenship & Immigr. Servs.*,
685 F. Supp. 3d 1000 (W.D. Wash. 2023) ........................................ 19

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ........................................ 47

*Morris Cty. Trust for Historic Pres. v. Pierce*,
714 F.2d 271 (3d Cir. 1983) ........................................ 28, 29

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ........................................ 7

*N. Cheyenne Tribe v. Norton*,
503 F.3d 836 (9th Cir. 2007) ........................................ 25, 33, 35, 40

*N. Oakland Voters All. v. City of Oakland*,
No. C-92-0743, 1992 WL 367096 (N.D. Cal. Oct. 6, 1992) ........................................ 29

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ........................................ 21, 46

*New Hope Family Servs., Inc. v. Poole*,
966 F.3d 145 (2d Cir. 2020) ........................................ 43

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........................................ 33

*ONDA v. U.S. Forest Serv.*,
465 F.3d 977 (9th Cir. 2006) ........................................ 31, 33, 36, 37

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001) ........................................................................ 47

*Pres. Coal., Inc. v. Pierce*,
667 F.2d 851 (9th Cir. 1982) ........................................................................ 10

*Pueblo of Sandia v. United States*,
50 F.3d 856 (10th Cir. 1995) ...................................................................... 6, 12

*Randle v. Crawford*,
604 F.3d 1047 (9th Cir. 2010) ...................................................................... 16

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) .................................................................... 31, 38

*Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*,
683 F.3d 1155 (9th Cir. 2012) .................................................................. 39, 41

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ...................................................................... 46

*Supermail Cargo, Inc. v. United States*,
68 F.3d 1204 (9th Cir. 1995) .................................................................... 18, 19

*Tadros v. Wilmington Trust, Nat'l Ass'n*,
No. 17-cv-1623, 2018 WL 2248453 (D. Or. May 15, 2018)..................................... 44

*Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) .......................................................................... 1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................................... 15

*Turner v. City & Cty. of S.F.*,
788 F.3d 1206 (9th Cir. 2015) ...................................................................... 11

*Tyler v. Cisneros*,
136 F.3d 603 (9th Cir. 1998) ............................................................28, 29, 30

*United States v. Boeing Co.*,
670 F. Supp. 3d 1185 (W.D. Wash. 2023) ..................................................... 19

*Van Buskirk v. Cable News Network, Inc.*,
284 F.3d 977 (9th Cir. 2002) ........................................................................ 20

*Vieux Carre Prop. Owners v. Brown*,
948 F.2d 1436 (5th Cir. 1991) .......... 28

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) .......... 18

*Wang v. Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013) .......... 16

*WATCH v. Harris*,
603 F.2d 310 (2d Cir. 1979) .......... 28

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018) .......... 22

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 27, 31, 32

*Yerger v. Robertson*,
981 F.2d 460 (9th Cir. 1992) .......... 28

**Statutes**

28 U.S.C. § 1291 .......... 5

28 U.S.C. § 1331 .......... 5

42 U.S.C. § 4332 .......... 10

54 U.S.C. § 300308 .......... 6

54 U.S.C. § 300320 .......... 6, 10

54 U.S.C. § 304108 .......... 6

54 U.S.C. § 306108 .......... 6, 10

**Regulations**

36 C.F.R. § 60.1 .......... 6

36 C.F.R § 800.1 .......... 8, 10

36 C.F.R. § 800.2 .......... 7, 8

36 C.F.R. § 800.3 .......... 7

36 C.F.R. § 800.4 .......... 7, 8, 9, 11

36 C.F.R. § 800.5 .......... 8, 9

36 C.F.R. § 800.6 .......... 9, 30

36 C.F.R. § 800.14 .......... 9, 10

36 C.F.R. § 800.16 .......... 6, 7

40 C.F.R. § 1505.2 .......... 10

43 C.F.R. § 2807.10 .......... 38

## LIST OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APA | Administrative Procedure Act |
| APE | Area of Potential Effect |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| LNTP | Limited Notice to Proceed |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NRHP | National Register of Historic Places |
| PA | Programmatic Agreement |
| ROD | Record of Decision |
| ROW | Right-of-Way |
| TCP | Traditional Cultural Property |

# INTRODUCTION

The San Pedro Valley ("the Valley"), one of the most intact cultural landscapes in the entire Southwest, holds immeasurable significance to the Tohono O'odham Nation and the San Carlos Apache Tribe. For millennia, Tribal members have fostered deep relationships with the Valley's landscape, riparian ecosystem, flora, and fauna, making it an inseparable part of their respective communities' cultural identities, collective histories, and continuing spiritual and religious observances.

Yet, without attempting to "stop, look, and listen" to the serious concerns voiced by these Tribes, *Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010), as required by the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-307108, Defendant Bureau of Land Management ("BLM") authorized Intervenor SunZia Transmission, LLC ("Intervenor") to begin constructing a massive transmission line through the heart of the Valley, permanently marring and desecrating this sacred cultural landscape, and irretrievably destroying the Traditional Cultural Properties ("TCPs") that are critical to the Tribes' history, culture, and religion. Indeed, BLM authorized this construction in the Valley by issuing Limited Notices to Proceed ("LNTPs") *before* completing a lawful Section 106 consultation process, in direct contravention of the NHPA. As such, the LNTPs are the first *and only* final agency decisions that authorized construction in the Valley with direct impacts to NHPA-protected resources and Plaintiffs' interests in them.

Within weeks of that decision, Plaintiffs timely challenged BLM's final decision to issue the LNTPs. Nevertheless, the district court dismissed Plaintiffs' claims as untimely, erroneously finding that Plaintiffs' claims under the NHPA were barred by the Administrative Procedure Act's ("APA") statute of limitations, which the court found accrued when BLM issued the 2015 Record of Decision ("ROD"). To reach this result, the district court disregarded Plaintiffs' well-pled allegations that challenged the LNTPs and BLM's Section 106 process—claims that accrued with the issuance of the LNTPs—and instead characterized the Complaint as challenging BLM's 2015 route-setting ROD issued pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347.

As intervening Supreme Court precedent holds, the point at which APA claims accrue—and thus when the statute of limitations begins to run—is when a plaintiff has a complete and present cause of action. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.,* 603 U.S. ___, 144 S. Ct. 2440, 2450 (2024). This occurs only when the agency issues a final action that will injure a plaintiff, regardless of whether the agency issued earlier actions that could contribute to that later, but not yet present injury. *See id.* Hence, the statute of limitations on an APA claim is tethered not to the issuance of the first in a series of final agency actions (here, the ROD), but to the agency's final approval (LNTPs) to commence activities that will actually cause a plaintiff's injury. This plaintiff-centric approach aligns with the core administrative law principle that agency action is presumptively reviewable under the APA.

Here, Plaintiffs' Complaint more than plausibly alleges that Plaintiffs' concrete cultural and historic preservation interests were injured by BLM's decision in the 2023 LNTPs to authorize construction in the Valley upon the flawed determination that no TCPs were present therein and without considering whether the Valley itself and the cultural landscapes are TCPs. Irrespective of whether the LNTPs constitute final agency action (they do), Plaintiffs' claims under the NHPA accrued in 2023, when BLM issued the LNTPs authorizing construction. Plaintiffs' lawsuit, filed mere weeks after BLM reinstated the decision that indisputably caused their injury, is timely.

Moreover, even *if* the operative accrual rule looked to final agency action (as opposed to injury), dismissal of Plaintiffs' lawsuit still would be inappropriate. Plaintiffs' Complaint plausibly alleged that the 2015 ROD did not serve—and in fact, *could not have served*—as BLM's final decision on Section 106 NHPA matters. In the ROD, as well as the 2014 Programmatic Agreement ("PA") that governs NHPA compliance for the Project, BLM explicitly assured Plaintiffs that detailed surveys for historic and cultural resources would be completed *after* initially establishing the route in the ROD. And, consistent with BLM's NHPA obligations, the ROD and PA provided that such surveys *would* be conducted—in close coordination with the Tribes—*before* any decision was made to proceed with construction, and that the Project could be "realigned" if necessary to avoid destroying or degrading areas of significant value to the Tribes.

Nonetheless, despite years of communications between BLM and Plaintiffs regarding the historic, cultural, and religious significance of the Valley, BLM issued the LNTPs in 2023, authorizing Project construction without ever conducting surveys for TCPs in the Valley or considering meaningful realignment or other alternatives required to avoid historic properties located therein. This violated the NHPA and the terms of the PA (and contradicted BLM's prior commitments to the Tribes).

Considering the plain language of the ROD and the PA, and the well-pled facts in Plaintiffs' Complaint, BLM's actions to carry out the PA's procedures did not conclude in 2015 (before they began), as the ruling below found, but in 2023 when BLM issued the LNTPs. *That* action necessarily signified that BLM believed it had satisfied its obligations under the PA and the NHPA. The contrary holding below is not only patently wrong as a legal matter, but egregiously unfair to Tribes that took BLM at its word that it would at least *consider* the Tribes' serious concerns regarding the significant adverse impacts the Project will have on the Valley's cultural landscapes (which are a specific type of historic property recognized under the NHPA's statutory and regulatory framework).

The U.S. government has a long and tragic history of disregarding Native Americans in favor of economic interests. This time, Plaintiffs simply ask that they be heard in court *before* their cherished ancestral lands, culture, and religious practices are permanently destroyed. Considering the tenuous basis for the ruling below, new Supreme Court precedent, and the fact that BLM assured Plaintiffs it would

meaningfully address their concerns one day (a day that never came), reversal for a determination on the merits is absolutely necessary.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1331. That court granted Defendants' and Intervenor-Defendant's separate motions to dismiss under Rule 12(b)(6) on June 6, 2024. *See* ER_3-9. Plaintiffs timely appealed on June 11, 2024. *See* ER_177-79. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the Supreme Court's recent decision in *Corner Post* dictates that Plaintiffs' claims accrued when BLM authorized construction by issuing the 2023 LNTPs, which marked the first time Intervenor could commence activities that cause concrete injuries to Plaintiffs' cultural and historic preservation interests in the Valley.

2. Whether Plaintiffs' claims accrued when BLM issued the 2015 ROD, i.e., before BLM undertook its NHPA obligations, or when BLM issued the 2023 LNTPs that—for the first time—authorized Project construction in the Valley and consummated BLM's deferred Section 106 consultation process under the NHPA.

# STATEMENT OF THE CASE

## I. LEGAL BACKGROUND

Under Section 106 of the NHPA, agencies "shall take into account the effect" of any "undertaking" on historic properties. 54 U.S.C. § 306108.[1] "Historic property" is broadly defined to include "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the [National Register of Historic Places ("NRHP")], including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308.[2] The Advisory Council on Historic Preservation ("ACHP") promulgates regulations implementing Section 106's requirements that are binding on all federal agencies. 54 U.S.C. § 304108(a).

Traditional Cultural Properties—or TCPs—are sites that are "eligible for inclusion in the [NRHP] because of [their] association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." *Pueblo of Sandia v. United States*, 50 F.3d 856, 859 n.2 (10th Cir. 1995) (quoting NAT'L PARK

[1] The term "undertaking" is broadly defined to mean "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency," and expressly includes activities "requiring a federal permit, license, or approval." 54 U.S.C. § 300320; *accord* 36 C.F.R. § 800.16(y).

[2] The NRHP comprises a list of "districts, sites, buildings, structures, and objects significant in American history . . . archeology . . . and culture." 36 C.F.R. § 60.1.

SERV., NAT'L REGISTER BULLETIN 38).[3] TCPs include "cultural landscapes," ER_45-46, which are "large-scale historic properties of religious and cultural significance to Native American Tribes, 'comprised of multiple, linked features that form a cohesive landscape.'" ER_46 (quoting ACHP, NATIVE AMERICAN TRADITIONAL CULTURAL LANDSCAPES ACTION PLAN (2011)). Such landscapes are eligible for inclusion in the NRHP where the landscape was the location of a significant event or activity, even if evidence of the event or activity is now absent. ER_45-46, ER_52.

Where an agency determines that an undertaking "has the potential to cause effects on historic properties," it must initiate the Section 106 consultation process with affected communities. 36 C.F.R. § 800.3. Relevant here, the agency must "consult with any Indian tribe[s] . . . that attach[] religious and cultural significance to historic properties that may be affected by [the] undertaking," even if the "area of potential effect" ("APE") is outside of reservation boundaries. 36 C.F.R. § 800.2; *see also id.* § 800.4(b).[4]

Consultation must afford Tribes "a reasonable opportunity to identify [] concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance,

---

[3] National Register Bulletin 38 "provides the recognized criteria for the Forest Service's identification and assessment of places of cultural significance." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 807 (9th Cir. 1999).

[4] The APE includes the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." 36 C.F.R. § 800.16(d).

articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2.[5] Agencies are admonished that "[c]onsultation should commence early in the planning process, in order to identify and discuss relevant preservation issues," and allow for consideration of "a broad range of alternatives." *Id.* §§ 800.1, .2. Consultation must also recognize the "unique legal relationship" between Tribes and the Federal government. *Id.* § 800.2.

During consultation, the agency must "[d]etermine and document the [APE]" of the undertaking. *Id.* § 800.4(a)(1). The agency must then "make a reasonable and good faith effort" to identify historic properties (including properties, such as TCPs, that may be eligible for inclusion in the NRHP) within the APE. Such efforts "may include background research, consultation, [and] oral history interviews." *Id.* § 800.4(b)(1). Agencies must "review existing information on historic properties within the [APE], including any data concerning possible historic properties not yet identified," *id.* § 800.4(a)(2), and must "[s]eek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties," *id.* § 800.4(a)(3). BLM has an affirmative obligation to "[g]ather information from any Indian tribe . . . to assist in

[5] "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the [NRHP] in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5.

identifying properties, including those located off tribal lands, which may be of religious and cultural significance to them and may be eligible for the National Register." *Id.* § 800.4(a)(4).

Once historic properties are identified, the agency must, "[i]n consultation with . . . any [affected] Indian Tribe," evaluate the effects the undertaking may have on historic properties. *Id.* § 800.5(a). Where the effects will be adverse, the agency must "consult" with "Indian Tribes" and others "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate" such effects. *Id.* § 800.6(a). Agreed-upon measures to avoid, minimize, or mitigate effects are documented in a memorandum of agreement. *Id.*

The NHPA's implementing regulations permit agencies to develop a PA in lieu of a memorandum of agreement to govern Section 106 compliance for a "complex" undertaking. *Id.* § 800.14(b). Once executed, the PA "govern[s] the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." *Id.* The PA may also provide for a "phased process" to conduct the identification of historic properties and evaluation of adverse effects. *Id.* § 800.4(b)(2). Such a process allows the agency to "defer final identification and evaluation of historic properties" when the "alternatives under consideration consist of corridors or large land areas." *Id.* However, the agency must "proceed with the identification and evaluation of historic properties" as specific aspects of an alternative are "refined." *Id.* An agency's subsequent "[c]ompliance with the

procedures established by an approved [PA] satisfies the agency's section 106 responsibilities for all individual undertakings . . . covered by the agreement." *Id.* § 800.14(b)(2)(iii).

## II. FACTUAL BACKGROUND

In 2008, Intervenor submitted an application to BLM for a right-of-way ("ROW") to construct and operate the Project, a commercial-scale transmission line spanning from New Mexico to Arizona. ER_53. Because the Project is both an "undertaking" under the NHPA, 54 U.S.C. § 300320, and a "major federal action" under NEPA, BLM had to comply with its distinct obligations under each statute. *Cf. Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982) ("[C]ompliance with the NHPA . . . does not assure compliance with NEPA."). The NHPA required BLM to undergo Section 106 consultation to "take into account the effect" of the "undertaking" on historic properties, 54 U.S.C. § 306108, by first identifying such resources and then "consider[ing] . . . alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties," 36 C.F.R § 800.1(c). Separately, NEPA required BLM to prepare an Environmental Impact Statement ("EIS") to examine the environmental effects of this action and alternatives for reducing such effects, 42 U.S.C. § 4332(C), and then document its consideration of such effects and alternatives in a ROD, *see* 40 C.F.R. § 1505.2.

BLM consummated its NEPA process in 2015 by issuing a ROD documenting its decision to grant Intervenor a ROW for the Project. ER_66; ER_134-35. Relevant

here, the 2015 ROD selected Intervenor's preferred route through the Valley. *See id.* However, in preparing its EIS and issuing the ROD, BLM expressly deferred Section 106 consultation under the NHPA until *after* the ROD and ROW were issued. The ROD specified that BLM's compliance with the NHPA, through the procedures established by the 2014 PA, "will be completed *after the ROD and right-of-way [ROW]* permit are issued, *but prior to project construction*." ER_167 (emphases added); *see also* ER_155 ("Cultural resources will continue to be considered during post-EIS phases of Project implementation in accordance with the executed PA," which "would involve intensive surveys to inventory and evaluate cultural resources").

The terms of the 2014 PA specified that in the post-ROD Section 106 consultation process, BLM would use established methods (as set forth in BLM Manual H-8110 and National Register Bulletin 38) to identify culturally significant landscapes and other TCPs, *see* 36 C.F.R. § 800.4(a), and consider measures, including "realignment of the transmission line," to avoid adverse effects to TCPs. ER_103-04; ER_110-11.[6] In line with the NHPA and its regulations, the PA provides that

[6] BLM disputes this characterization of the PA. However, at this stage, the Court must assume the truth of Plaintiffs' factual allegations, *see Turner v. City & Cty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015), including its well-pled allegation that the plain language of the PA requires BLM to consider alternatives to avoid identified TCPs, including through realignment of the Project. Additionally, while the PA is incorporated by reference into Plaintiffs' Complaint, and as such, this Court "may assume [its] contents are true for purposes of a motion to dismiss under Rule 12(b)(6), . . . it is improper to assume the truth of [the PA] if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (citation and internal quotation marks omitted).

"[r]equests for authorizations of construction [i.e., LNTPs] will be approved *only if such authorizations will not restrict subsequent measures to avoid, minimize or mitigate the adverse effects to historic properties through rerouting of the corridor or placement of ancillary facilities*." ER_109 (emphasis added); *see also* ER_65.

After issuing the ROD and the ROW, the Section 106 process continued in the sequence set forth in the PA. *See* ER_66-67. While they awaited a final BLM decision under the NHPA in order to ascertain BLM's compliance or lack thereof with that law, Plaintiffs repeatedly urged BLM to conduct a cultural landscape study to identify TCPs that Plaintiffs believe, based on their longstanding knowledge, to exist in the Valley. *Id.* A cultural landscape study is the well-established, primary method of identifying cultural landscapes and TCPs eligible for listing in the NRHP. However, as Plaintiffs alleged, BLM *never* conducted the long-promised cultural landscape study or utilized any other established method, as required by the PA, to identify cultural landscapes or other TCPs. *See, e.g.*, ER_67-79; *see also* ER_110-11 (requiring BLM to "ensure that all work and reporting performed under this [PA]" is consistent with BLM Manual 8110, Manual Supplement H-8100-1, and National Register Bulletin 38); *Pueblo of Sandia*, 50 F.3d at 859 (explaining that "[c]onsistent with [National Register] *Bulletin 38*," an analysis to identify TCPs "should include interviews with appropriate [Tribal] representatives, field inspections and documentation").

In September 2023, BLM issued an LNTP authorizing Intervenor to "proceed with construction" of the Project in the Valley. ER_82-83; *see also* ER_174. The

LNTP was based on BLM's conclusion, determined for the first time, that "there are no historic properties [including TCPs] present" in the Valley that would be adversely affected by Project construction. ER_82-83; *see also* ER_174.

## III. <u>PROCEEDINGS BELOW</u>

After initial attempts to administratively resolve their disputes regarding BLM's failed NHPA compliance—which resulted in BLM suspending the LNTP before later reinstating it, ER_82-89—Plaintiffs filed this case alleging that BLM acted arbitrarily, capriciously, and contrary to law in issuing the LNTPs, and thus authorizing construction in the Valley, without first complying with its NHPA obligations. ER_32-95. Specifically, Plaintiffs challenged BLM's failure to make a reasonable, good-faith effort to identify TCPs or to consider measures for avoiding effects to any TCPs ultimately identified. Plaintiffs also challenged BLM's failure to engage in meaningful government-to-government consultation with the Plaintiff Tribes regarding the consideration and identification of TCPs, as required by the NHPA. See ER_91-93.[7]

On March 15, 2024, Intervenor moved to dismiss Plaintiffs' Complaint under Rule 12(b)(6) for failure to state a claim. ER_187. Intervenor argued that Plaintiffs

[7] The ruling below frames Plaintiffs' claims as "seek[ing] to reroute the Project out of the [Valley]," ER_7. But Plaintiffs' Complaint seeks only to vacate the LNTPs and order BLM to conduct further NHPA-required process to identify TCPs and then consider measures to avoid effects to TCPs. *See* ER_93-94. Whether BLM would ultimately deem routing adjustments necessary is *not* at issue in this lawsuit.

cannot identify a final agency action within the statute of limitations that violated the NHPA. On March 29, 2024, BLM filed its own motion to dismiss, asserting that Plaintiffs failed to challenge a reviewable final agency action within the applicable statute of limitations and that Plaintiffs failed to allege BLM violated the PA. ER_187.

On June 6, 2024, the district court granted the motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). ER_3-9.[8] Characterizing the Complaint as a challenge to BLM's 2015 ROD, the court determined that Plaintiffs' Complaint was barred by the statute of limitations and the LNTPs do not constitute a final agency action. *Id.* In a footnote, the district court also asserted that "Plaintiffs failed to plausibly allege that the BLM failed to comply with the PA," based upon its earlier determination during preliminary injunction proceedings that Plaintiffs were unlikely to succeed on the merits of their claims. ER_7 n.9. On June 11, 2024, Plaintiffs timely appealed. ER_177-79.

## **STANDARD OF REVIEW**

This Court reviews *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Ariz. All. for Cmty. Health Ctrs. v. Ariz. Health Care Cost Containment Sys.*, 47 F. 4th 992, 998 (9th Cir. 2022). A motion under Rule 12(b)(6)

[8] On April 16, 2024, prior to ruling on the motions to dismiss, the district court denied Plaintiffs' requests for a temporary restraining order or a preliminary injunction. On May 13, 2024, this Court denied an injunction pending appeal without addressing the merits of the parties' arguments. On May 20, 2024, this Court granted Plaintiffs' motion for voluntary dismissal of their interlocutory appeal.

may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, construing the complaint in the light most favorable to the plaintiff." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004) (citations and internal quotation marks omitted).

The plausibility requirement is not a probability requirement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, factual allegations need only "be enough to raise a right to relief above the speculative level." *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556.

The ruling below resolved the motions to dismiss under Rule 12(b)(6); it did not convert the motions into motions for summary judgment, nor could it, given that there is not yet an administrative record. Accordingly, the scope of review is confined to the Complaint, documents incorporated into the Complaint by reference, and matters of which a court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (summarizing the documents a court generally may consider when adjudicating a 12(b)(6) motion).

## SUMMARY OF ARGUMENT

1. The Supreme Court has repeatedly stressed the "strong presumption" in favor of judicial review of agency action. Most recently, in *Corner Post*, decided earlier this month, the Supreme Court reaffirmed this presumption by adopting a "plaintiff-

centric accrual rule" for claims arising under the APA. 144 S. Ct. at 2458. Under this rule, the statute of limitations for APA claims begins to run not when the agency takes final agency action, "but only after the plaintiff suffers the injury required to press her claim in court." *Id.* at 2451. Accordingly, the *Corner Post* test looks to the date when a plaintiff's injury becomes concrete—not the date an agency action became final—to determine when a claim accrues and the statute of limitations begins to run.[9]

Here, the injury to Plaintiffs' interests in historic properties in the Valley only materialized once BLM authorized Intervenor to commence Project construction in late 2023. ER_174. Thus, under the *Corner Post* test, Plaintiffs' claims did not accrue—and the APA's six-year statute of limitations did not begin to run—until BLM issued the LNTPs in 2023, allowing Intervenor to start construction. Plaintiffs' Complaint, filed mere weeks after BLM issued the reinstated LNTP and thereby caused their claims to accrue, is timely.

2. Alternatively, the district court erred by dismissing Plaintiffs' Complaint because it specifically alleges that BLM failed to lawfully complete its NHPA Section 106 obligations before issuing the LNTPs that authorized construction in the Valley. Applying the liberal pleading standard that governs at this stage, the district court was

[9] Although Plaintiffs did not raise this argument in the district court, the Court "may consider new arguments on appeal if the issue arises because of an intervening change in law." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 543 (9th Cir. 2013). The Supreme Court issued *Corner Post* on July 1, 2024, after the district court's ruling. Accordingly, this Court may consider arguments based on this new controlling authority. *See Randle v. Crawford*, 604 F.3d 1047, 1056 (9th Cir. 2010).

required to conclude that Plaintiffs plausibly alleged that BLM violated the NHPA, the LNTPs are final agency actions, and Plaintiffs brought suit within six years of the date their claims accrued.

## ARGUMENT

In the wake of *Corner Post*, there are two frameworks for determining when a claim accrues under the APA. Under the *Corner Post* test, the touchstone for accrual is the date the plaintiff's injury crystallizes; a "right of action 'accrues,'" and the statute of limitations begins to run, "when the plaintiff . . . suffers an injury from final agency action." 144 S. Ct. at 2450. In contrast, under the final-agency-action test—applicable at the time the district court rendered its decision—the touchstone for accrual is finality; a cause of action accrues, and the statute of limitations begins to run, when the agency issues a final agency action that aggrieves the plaintiff.

Here, Plaintiffs' Complaint was filed well within the statutory limitations period, whether dated from the date Plaintiffs' injury solidified, or from the date that BLM issued the final agency action relevant to Plaintiffs' NHPA claims. Plaintiffs filed their Complaint weeks after BLM consummated its NHPA decisionmaking process and altered the status quo on the ground, by issuing the 2023 LNTPs authorizing Project construction in the Valley. The LNTPs marked BLM's sole determination that no historic properties (including TCPs) are present in the Valley, and also, for the first time, authorized activities that injure Plaintiffs' cultural and historic preservation

interests by allowing Intervenor to break ground in the Valley. Thus, under either framework for assessing the accrual of APA claims, Plaintiffs' challenges are timely.

## I. <u>DISMISSAL IS INAPPROPRIATE</u>

As an initial matter, a claim may be dismissed as untimely pursuant to a Rule 12(b)(6) motion "only when the running of the statute [of limitations] is apparent on the face of the complaint." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (internal quotation marks omitted). "[A] complaint cannot be dismissed [on statute of limitations grounds] unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995).

As demonstrated below, there are no facts on the face of Plaintiffs' Complaint that foreclose a showing of a timely challenge to final agency action. Likewise, under the *Corner Post* rule, Plaintiffs' claims did not accrue until they "suffer[ed] an injury" from BLM's decision to authorize construction without first complying with the NHPA. 144 S. Ct. at 2450. Construing the Complaint's factual allegations in Plaintiffs' favor, Plaintiffs plausibly allege that they suffered an injury from BLM's decision to authorize construction on the basis of its final determination that there are no historic properties in the Valley. *See, e.g.*, ER_90-91 (alleging that construction activities are "causing and will continue to cause serious adverse effects to historic properties," and that "Plaintiffs are harmed by the irreversible, adverse effects to these historic properties, including [TCPs]").

Hence, Plaintiffs' claims accrued once that injury occurred—i.e., in 2023 when BLM issued the LNTPs. Plaintiffs' Complaint thus makes concrete factual allegations that, taken as true, show that the statute of limitations period did not expire before Plaintiffs filed suit. Accordingly, dismissal is inappropriate. *See Supermail Cargo*, 68 F.3d at 1206 n.2; *United States v. Boeing Co.*, 670 F. Supp. 3d 1185, 1194 (W.D. Wash. 2023) (declining to dismiss where it was not apparent from the face of the complaint that the statute of limitations had run prior to filing the action).

Even assuming *arguendo* that the final-agency-action rule for accrual applies, Plaintiffs' Complaint plausibly alleges a timely challenge to final agency action. Nothing on the face of the Complaint—or within any documents incorporated by reference or subject to judicial notice—indicates that the 2015 ROD or ROW constituted the agency's final decision *under the NHPA*. To the contrary, Plaintiffs sufficiently allege that the LNTPs constituted BLM's final decision with respect to NHPA Section 106 compliance. As a result, Plaintiffs' cause of action accrued when BLM issued the LNTPs, and Plaintiffs timely filed suit weeks after BLM reinstated its decision. *Mansor v. U.S. Citizenship & Immigr. Servs.*, 685 F. Supp. 3d 1000, 1010 (W.D. Wash. 2023) (citing *Wind River Min. Corp. v. United States*, 946 F.2d 710, 712 (9th Cir. 1991) (explaining that a cause of action accrues with the final agency action)). Accordingly, even under the final-agency-action test, BLM's statute of limitations defense is inappropriate for resolution on a motion to dismiss. *See Supermail Cargo*, 68 F.3d at 1206 n.2; *Boeing Co.*, 670 F. Supp. 3d at 1194.

In reaching a contrary conclusion, the district court's opinion incorporates its order denying Plaintiffs' motion for a preliminary injunction. However, the district court did not convert the motions to dismiss to motions for summary judgment. *See* Fed. R. Civ. P. 12(d). The district court's review was therefore confined to the Complaint and those documents incorporated into the Complaint by reference—here, the 2015 ROD and the PA. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).[10]

Thus, to the extent the district court's ruling on the motions to dismiss relied upon the preliminary injunction record and any factual findings made on the basis of that evidence, such reliance was inappropriate. *Cf. B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 112 & n.5 (9th Cir. 2024) (acknowledging that a ruling on motions to dismiss must "accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff," while the court "review[s] the factual findings underpinning a preliminary injunction for clear error" (citations omitted)); *Twombly*, 550 U.S. at 556 (explaining that a claim "may proceed even if it strikes a savvy judge that actual proof of [necessary] facts is improbable," and the plaintiff is unlikely to succeed on the merits); *Lau v. FBI*, No. 23-cv-00329, 2024 WL 624023, at

[10] Defendants and Intervenor argued in their respective motions to dismiss that the 2015 ROD (which incorporates the PA) and the LNTPs are incorporated by reference into Plaintiffs' Complaint. In their opposition, Plaintiffs conceded that the 2015 ROD and LNTPs are subject to judicial notice. The district court determined that the "2015 ROD and the PA are documents incorporated into the Complaint." ER_6.

*4 (D. Haw. Feb. 14, 2024) (finding that while plaintiff's claims may be unlikely to succeed on their merits, they nevertheless were sufficiently plausible to survive a motion to dismiss, and noting that the "plausibility standard is not akin to a 'probability requirement'" (quoting *Iqbal*, 556 U.S. at 678). Additionally, to the extent that the ruling below drew inferences from the incorporated documents—i.e., the 2015 ROD and PA—it was "improper" where "such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

In short, Plaintiffs' allegations are neither conclusory nor facially implausible, such that they may be dismissed as a matter of law. The Complaint contains specific allegations regarding: (1) BLM's Section 106 process, (2) Plaintiffs' extensive engagement with BLM regarding their concerns with the Project's adverse effects on TCPs in the Valley (including cultural landscapes), (3) BLM's repeated refusal to take those concerns seriously and engage in meaningful consultation as required by the NHPA and the PA, (4) BLM's approval of Project construction prior to concluding a lawful Section 106 consultation process, and (5) the concrete injuries Plaintiffs suffered as a result. *See generally* ER_51-91. Although the Complaint provides ample evidence for these allegations, the merit of those allegations is not before the Court at this stage. Rather, the Court must take Plaintiffs' allegations as true and draw all reasonable inferences in Plaintiffs' favor. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Applying the proper standard, BLM violated the NHPA and Plaintiffs timely brought suit. Accordingly, the judgment below must be reversed and the case

allowed to proceed to the merits, where judicial review will benefit from the full administrative record.

## II. CONTROLLING AUTHORITY COMPELS THE CONCLUSION THAT PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

The Supreme Court has repeatedly stressed the "strong presumption" that anyone injured by agency action should have access to judicial review. *See, e.g.*, *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (internal quotation marks omitted); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22-23 (2018). Most recently, in *Corner Post*, the Supreme Court reaffirmed this well-established presumption, adopting a "plaintiff-centric accrual rule" for claims arising under the APA. 144 S. Ct. at 2458. There, the Court rejected the final-agency-action rule—relied upon by the district court in this case—whereby a cause of action accrues at the point of final agency action. *Id.* at 2450. Instead, the Supreme Court recognized the traditional, long-standing rule that "[a] right of action 'accrues'" when the plaintiff has a "complete and present cause of action"—i.e., when she has the right to "file suit and obtain relief." *Id.* (citation omitted). In the context of the APA, a "plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action, so the statute of limitations does not begin to run until she is injured." *Id.*

In the wake of *Corner Post*, a right of action under the APA accrues when there is *both* a final agency action, *and* the plaintiff is injured by that final action. *Id.* (noting that the injury and finality requirements "work hand in hand: Each is a necessary, but

not by itself . . . sufficient, ground for stating a claim under the APA" (citation and internal quotation marks omitted) (alteration in original)). Here, the district court dismissed Plaintiffs' claims on the purported basis that Plaintiffs failed to challenge a final agency action within the applicable six-year limitations period. *See* ER_6-8. However, pursuant to *Corner Post*, the operative test for accrual is when the *injury* occurs, not when the agency action became final. *See* 144 S. Ct. at 2450. In light of this intervening, controlling precedent, the district court's ruling, which based its order of dismissal solely on the question of finality, is in error and must be reversed.

An APA claim "does not 'accrue' as soon as the defendant acts, but only after the plaintiff suffers the injury required to press her claim in court." *Corner Post*, 144 S. Ct. at 2451; *accord Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1396 (9th Cir. 1986) ("Under federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action."). Here, Plaintiffs *could not* have been injured by the 2015 ROD because the ROD did not concretely affect Plaintiffs' interests in historic properties in the Valley. Under *Corner Post*, that injury necessarily occurred only when BLM approved construction in the LNTPs.[11]

[11] Thus, even if that the district court correctly characterized Plaintiffs' Complaint as challenging the 2015 ROD (which Plaintiffs dispute), *Corner Post*'s plaintiff-centric accrual rule would permit Plaintiffs to bring this action within six years of *the injury* resulting from that final action, which could not and did not accrue until BLM issued the LNTPs in 2023 that actually authorized construction in the Valley.

Indeed, the ROD explained that the NHPA process "is ongoing" and the identification and evaluation of historic properties—as well as the consideration of measures to resolve adverse effects to identified properties—would occur "during post-EIS phases of Project implementation in accordance with the executed PA." ER_155; *see also* ER_167 (explaining that "the identification and evaluation process provided in the PA *will be completed after the ROD . . . but prior to Project construction*" (emphasis added)).

The injury to Plaintiffs' concrete interests in historic properties in the Valley occurred only once BLM conclusively determined that construction could proceed in the Valley on the purported grounds that "there are no historic properties present in the transmission structure spans and roads subject to this LNTP." ER_174. Up until that point—i.e., when BLM issued the LNTPs—Plaintiffs' concrete interests could not have been injured because they did not know whether (and to what extent) BLM would work to identify historic properties and resolve the Project's adverse effects on those properties, as required by the ROD, the PA, and the NHPA. Indeed, the ROD and PA obligated BLM to consider information generated and submitted during the ongoing NHPA consultation process to, *inter alia*, identify historic properties, evaluate the effects of the Project on those properties, and work to "avoid adverse effects to all types of historic properties," including by "realign[ing]" the Project. ER_103; *see also* ER_100-03; ER_155; ER_167. Thus, Plaintiffs' injuries only crystallized once

BLM authorized construction without first complying with its obligations under the NHPA.

Critically, this conclusion is not dependent on whether the LNTPs constitute final agency action (which, as explained *infra* at 34-38, they unquestionably did). The APA's finality and injury requirements "work hand in hand: Each is a necessary, but not by itself . . . sufficient, ground for stating a claim under the APA." 144 S. Ct. at 2450. Here, there is no question that BLM took final agency action; the principal dispute below was *when* that final agency action occurred for the purposes of the NHPA (as distinct from other statutory obligations). What matters under the *Corner Post* rule is not simply finality, but when Plaintiffs suffered an injury. *See id.*

Here, it could not be clearer that the 2015 ROD did not injure Plaintiffs because it did not authorize Intervenor to commence construction. *See* ER_100-03; ER_155; ER_167. At the time the ROD was issued, any injury to Plaintiffs' interests was tentative, as they did not know whether or how BLM would carry out its NHPA Section 106 obligations. *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 845-46 (9th Cir. 2007) (resolving NEPA claims but finding NHPA claims unripe because the ROD and EIS provided for post-ROD "consultation with tribes," and there was not yet "a specific final agency action [that] has an actual or immediately threatened effect" on cultural resources). The injury to Plaintiffs' historic preservation interests only became sufficiently concrete to support a cause of action once BLM approved construction by issuing the LNTPs without engaging in and completing a lawful Section 106 process,

as required by the ROD, the PA, and the NHPA. Until Plaintiffs suffered this injury, they lacked a "complete and present cause of action." 144 S. Ct. at 2450. Thus, notwithstanding the finality of the 2023 LNTPs, the statute of limitations *could not* have been triggered by the 2015 ROD because BLM's then-unknown failure to comply with the NHPA had not yet concretely injured Plaintiffs' interests.

In sum, *Corner Post* compels the conclusion that where, as here, Plaintiffs are not injured unless and until an agency takes a subsequent action, the precise date and contours of which are yet-to-be-determined, the statute of limitations only begins to run once the injury crystallizes. This rule "vindicates the APA's 'basic presumption' that anyone injured by agency action should have access to judicial review," and "also respects [the Court's] 'deep-rooted historic tradition that everyone should have his own day in court.'" 144 S. Ct. at 2459 (citations omitted). Here, Plaintiffs' claims are timely because they were brought once Plaintiffs' injuries concretely materialized when BLM authorized construction—for the first time—in the 2023 LNTPs.

## III. PLAINTIFFS TIMELY CHALLENGED THE FINAL AGENCY ACTIONS (THE LNTPs) THAT CONSUMMATED BLM'S NHPA DECISIONMAKING PROCESS

The Court need not reach the question of finality to determine the point at which Plaintiffs' claims accrued because *Corner Post* controls this appeal. However, if the Court instead determines that the final-agency-action accrual rule controls, the outcome remains the same: Plaintiffs' challenges to BLM's Section 106 process are

timely when BLM, *for the first time*, purported to complete its NHPA obligations in 2023 by issuing the LNTPs that authorized construction in the Valley.

Applying the final-agency-action rule, the district court held that BLM's 2015 ROD that it issued under NEPA constituted the focal point of judicial review for *all* Project-related challenges, even those arising under other laws that BLM had not satisfied (or even attempted to satisfy) at the time of the ROD. ER_6-7. This was in error because Plaintiffs' NHPA claims could not have accrued until BLM's Section 106 process concluded and resulted in a final agency action containing the agency's findings required by the NHPA, an event that did not occur until well *after* it issued the 2015 ROD—i.e., BLM made those findings in the 2023 LNTPs. ER_174-75. Thus, the district court erred by determining that the statute of limitations began to run *before BLM completed the NHPA process,* a position that makes no legal or logical sense because it would completely insulate BLM's NHPA compliance from judicial review in this case—i.e., Plaintiffs' claims would be premature until suddenly untimely.

Rather, as a matter of logic and law, the LNTPs constitute BLM's *sole* determination under the NHPA that Project construction in the Valley would not adversely affect historic properties, and the LNTPs likewise signify BLM's "last word" on the Project's purported compliance with the NHPA. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Accordingly, Plaintiffs' timely challenge to BLM's unlawful NHPA process must be allowed to proceed.

### A. <u>The NHPA Applies To All Stages Of The Project</u>

The weight of authority—including this Court's rulings—holds that the NHPA applies to *all* unexecuted parts of a project, as long as the agency has "continuing authority" to require consideration of historic preservation issues. *See, e.g.*, *Tyler v. Cisneros*, 136 F.3d 603, 608-09 (9th Cir. 1998); *WATCH v. Harris*, 603 F.2d 310, 325-26 (2d Cir. 1979) (concluding that Section 106 "requires" an agency to complete consultation "as long as [the agency] retains the authority" to "make . . . approvals" pursuant to the initial decision); *Morris Cty. Trust for Historic Pres. v. Pierce*, 714 F.2d 271, 279-281 (3d Cir. 1983) (holding that the NHPA "applie[s] to ongoing Federal actions as long as a Federal agency has opportunity to exercise authority at any stage of an undertaking where alterations might be made to modify its impact on historic preservation goals"); *Vieux Carre Prop. Owners v. Brown*, 948 F.2d 1436, 1444-45 (5th Cir. 1991) (citing cases standing for this proposition).

Courts (including this one) have rejected the proposition that an initial project approval operates as a cut-off date for the application of the NHPA, particularly where, as here, the agency *expressly defers* its Section 106 process to a later date. *See, e.g.*, *Yerger v. Robertson*, 981 F.2d 460, 465-66 (9th Cir. 1992) (finding no violation of the NHPA where an order issued before the conclusion of the NHPA process "is contingent on [later] compliance" with Section 106).

Bucking this binding precedent, the ruling below insists that the "ongoing nature of the Section 106 process did not affect the finality" of the route selected by

BLM in the 2015 ROD. ER_7. The district court's ruling thus appears to acknowledge BLM's *continuing authority* over the Project, but it skirts the critical facts that under the plain terms of the PA, that authority empowered BLM: (1) to "approve or disapprove" Project construction based upon the results of the deferred Section 106 consultation process "after the ROD and [ROW] permit are issued," ER_167; and (2) to require modifications to the Project—including realignment of the route—to address and resolve historic preservation concerns. *See* ER_103; *see also Tyler*, 136 F.3d at 608-09 (recognizing that the NHPA applies to successive stages of a project where the agency has continuing authority under a PA); *accord Morris Cty.*, 714 F.2d at 280 (explaining that the NHPA is applicable to an ongoing project at any stage where a "Federal agency has authority to approve or disapprove" the project and "provide meaningful review of . . . historic preservation . . . goals").

Nor does the ruling below grapple with the fact that BLM specifically designed the Project's Section 106 process to occur and conclude *after* BLM issued the ROD and ROW. *See* ER_167. BLM "may not create a process and then fail to . . . utilize this process." *Acuna v. USDA*, No. CV-16-00271, 2017 WL 11696487, at *3 (D. Ariz. Sept. 14, 2017). Under analogous facts—where the agency-selected NHPA approach is designed to continue after it issues an initial decision—courts have held that the statute of limitations begins to run not from the initial approval of the project, but from the date the Section 106 review is *completed*. *See N. Oakland Voters All. v. City of Oakland*, No. C-92-0743, 1992 WL 367096, at *11 (N.D. Cal. Oct. 6, 1992).

The same outcome is required here. As Plaintiffs plausibly alleged (and the ROD and PA show), BLM did not consider the effects of the ROW on historic properties within the Valley in the initial approval (i.e., the ROD). Thus, contrary to the ruling below, BLM was required to consider the effects of the authorized activities on historic properties in the Valley including TCPs, as well as "alternatives or modifications to the undertaking that could avoid, minimize, or mitigate" such "effects," 36 C.F.R. § 800.6(a), *before* issuing any LNTPs that will impact those properties in a concrete manner. *Accord Tyler*, 136 F.3d at 608-09 (recognizing that where agency enters into a PA that gives it "continuing authority" over undertakings, "it has voluntarily assumed an obligation that is enforceable"). It necessarily follows that Plaintiffs may challenge BLM's failure to comply with those duties once its NHPA decisionmaking process is final.

### B. <u>The ROD Was Not BLM's Final Decision Under The NHPA</u>

BLM argued—and the ruling below erroneously agreed—that the 2015 ROD started the statute of limitations for all Project-related claims that had already accrued (e.g., NEPA claims) and that *might* later accrue after the ROD. ER_8.

Prior to the Supreme Court's recent decision in *Corner Post*, APA challenges accrued on the date of the "final agency action" that aggrieves a plaintiff in a concrete way. *See Harrosh v. Tahoe Reg'l Plan. Agency*, 640 F. Supp. 3d 962, 976-77 (E.D. Cal. 2022) (explaining that claims under the APA accrue when the agency takes final action). Agency action is "final" where: (1) the action marks the "consummation" of

the agency's decisionmaking process; and (2) the action is one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). To determine whether an agency action is "final" under the *Bennett* test, courts must "focus on the practical and legal effects of the agency action," not on labels, and must interpret finality "in a pragmatic and flexible manner." *ONDA v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (cleaned up). As a matter of law and fact, the ROD did not serve—and indeed, could not have served—as BLM's final decision under the NHPA.[12]

Here, the ROD *could not* have "consummat[ed]" BLM's decisionmaking process with respect to its obligations under the NHPA (and PA). *Bennett*, 520 U.S. at 178. Indeed, BLM expressly *declined* to resolve NHPA issues in the ROD, instead deferring those distinct obligations to subsequent BLM actions that "will be completed after the ROD . . . but prior to Project construction." ER_167; *see also* ER_155 (acknowledging that the NHPA process "was ongoing" and would "continue . . . during post-EIS phases of Project implementation").

Accordingly, BLM's final NEPA decision in the 2015 ROD could *not* serve as BLM's "'last word on the [NHPA] matter in question,'" *Whitman*, 531 U.S. at 478—

[12] No one disputes that the ROD constituted BLM's final decision under NEPA, or that the ROW concluded the Federal Land Policy and Management Act ("FLPMA") process. But those approvals do not relieve BLM of its *separate* legal obligation to comply with the NHPA. *Cf. San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640 (9th Cir. 2014) ("[A]n agency cannot escape its obligation to comply with [one statute] merely because it is bound to comply with another statute.").

i.e., the mandatory identification of cultural landscapes and other TCPs, and the consideration of alternatives to avoid such properties, as required by the NHPA—because BLM never attempted to identify TCPs using established methods for doing so prior to issuing the ROD. *See* ER_167; *see also* ER_68 (BLM conceding in 2022 that "an inventory for [TCPs] has not been completed at this time"). Nor could the ROD have served as BLM's "last word" that construction activities in the Valley would not adversely affect historic properties because no such determination had yet been made. *Whitman*, 531 U.S. at 478. Hence, as it concerns BLM's post-ROD compliance with the NHPA or the existence of TCPs, the ROD was neither "final" nor "reviewable" under the APA and could not have been until BLM took some action demonstrating its purported completion of those deferred obligations. *Id.* Here, BLM did that with the LNTPs, eight years after issuing its ROD under NEPA.

The ROD also failed to determine "rights or obligations" under the NHPA, or give rise to "direct and appreciable legal consequences" with respect to historic preservation issues. *Bennett*, 520 U.S. at 178. By its plain terms, the ROD "*does not authorize* [Intervenor] to commence construction of any Project facilities or to proceed with other ground-disturbing activities in connection with the Project on federal lands." ER_137 (emphasis added). Therefore, BLM's issuance of the ROD did not alter either BLM's or Intervenor's day-to-day activities in any way relevant to Plaintiffs' claim that BLM failed to carry out its obligations under the NHPA (and the PA).

Rather, the legal authorization to commence construction (i.e., the LNTPs) was contingent on BLM's lawful completion of its NHPA duties, which occurred only after the ROD. *See id.* (BLM's 2015 ROD stating that "[t]his Decision *does not authorize the Applicant to commence construction* of any Project facilities . . . *until the Applicant* . . . receives and accepts the [ROW] grant, *and also receives a written Notice to Proceed* . . . that *must be approved* by BLM's Authorized Officer" (emphases added)). Thus, it was the LNTPs, and *only* the LNTPs, that had a "direct and immediate effect on the day-to-day business of" relevant stakeholders under the NHPA. *ONDA*, 465 F.3d at 990 (cleaned up). Because the ROD did not change any legal rights or obligations under the NHPA, it cannot qualify as final agency action for purposes of the NHPA under *Bennett*'s second prong. *Id.* at 987. Hence, the ROD fails to qualify under either *Bennett* prong as the relevant final agency action for the accrual of Plaintiffs' NHPA claims.

The dispositive fact remains that BLM *expressly designed* the NHPA process to conclude *after* it issued the ROD in 2015. *Cf. Acuna*, 2017 WL 11696487, at *3 (explaining that an agency "may not create a process and then fail to . . . utilize this process"). Fairness dictates that where BLM elects to bifurcate the NEPA and NHPA processes—thereby placing Tribes at a disadvantage by issuing a ROD before historic resources are identified, let alone avoided—it must face the consequences of that choice. *Cf. Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them.").

Accordingly, claims under the NHPA could not have accrued in 2015 because Plaintiffs did not know what BLM's subsequent decision under the NHPA would be and thus no case or controversy yet existed, as this Court has held. *See N. Cheyenne Tribe*, 503 F.3d at 845-46 (finding NHPA claims unripe because although there was a final NEPA decision ripe for review, there was not yet "a specific final agency action [that] has an actual or immediately threatened effect" on historic properties). Instead, Plaintiffs' claims challenging BLM's compliance with the NHPA accrued once BLM concluded its NHPA decisionmaking by issuing the LNTPs that authorized construction in the Valley, *see Harrosh*, 640 F. Supp. 3d at 976-77, thereby altering the legal regime and injuring Plaintiffs' historic and cultural preservation interests in a concrete manner for the first time.

### C. **<u>The LNTPs Constitute Final Agency Action For BLM's Decisionmaking Process Under The NHPA</u>**

In concluding that the LNTPs at issue do not constitute final agency action, the ruling below fails to acknowledge the critical role that the LNTPs played in *this* decisionmaking process. To be clear, Plaintiffs do not argue that a notice to proceed is the relevant final agency action in *every* case. Rather, Plaintiffs advance the modest position that under these facts, where BLM deferred NHPA compliance *until after* it issued the ROD and ROW—and specifically prohibited construction until the agency

made findings through a notice to proceed that it had satisfied its NHPA obligations—the LNTPs here reflect BLM's final decision under the NHPA.[13]

Here, the LNTPs satisfy *Bennett*'s first prong, as they "consummate[d]" BLM's decisionmaking process *under the NHPA*. Neither the ROD, nor the ROW, conclusively determine what can be built or the terms applicable to that construction. *See* ER_137. Instead, the LNTPs provide such authorization and purport to ensure compliance with the NHPA by imposing limitations on the types and locations of activities permitted. *See* ER_109; ER_174-76; *see also* ER_65. Indeed, by the PA's plain terms, issuing the LNTPs hinged directly on BLM's determination that adverse effects to historic properties had been adequately identified, evaluated, and resolved, *including through consideration of realignment of the Project and other options for avoiding adverse effects to historic properties*. ER_109; *see also* ER_65.

Moreover, until BLM issued the LNTPs, the ROD and PA obligated BLM to consider information generated and submitted during the ongoing consultation process under the NHPA to identify historic properties, evaluate the Project's effects on those properties, and consider how to "avoid adverse effects to all types of historic properties," including by "realign[ing]" the Project. ER_103; *see also* ER_100-03; ER_155; ER_167. In other words, until BLM issued the LNTPs determining that it

[13] In contrast, where an agency concludes its NHPA process before issuing a ROD under NEPA—rather than deferring it until after the ROD—a post-ROD notice to proceed likely would not mark the consummation of the NHPA process.

had satisfied its NHPA obligations with respect to the Valley, BLM's Section 106 consultation process was neither finalized nor ripe for review; until then, BLM had to continue considering the Project's effects on historic properties and methods to resolve such effects. *See N. Cheyenne Tribe*, 503 F.3d at 845-46. Consequently, prior to the LNTPs, Plaintiffs did not know *whether* or to *what extent* BLM's eventual decision to authorize construction might contravene the NHPA or the PA's procedures. *See id.*

Accordingly, the LNTPs—not the ROD—served as BLM's "last word" (and its *only* word) that it had, in its view, satisfied its duties under the NHPA and the PA, including its obligation to identify and consider alternatives to avoid cultural landscapes and other TCPs in the Valley, despite never having attempted to identify TCPs using established methods for doing so. *See* ER_174-76.[14]

The LNTPs also satisfy *Bennett's* second prong. Unlike the ROD that expressly *prohibited* construction, ER_137, the LNTPs altered the legal regime by immediately authorizing construction in the Valley that could not occur prior to the LNTPs—approval expressly predicated on BLM's arbitrary findings under the NHPA that "there are no historic properties [including TCPs] present in the transmission structure spans and roads subject to this LNTP." ER_174; *see ONDA*, 465 F.3d at 982 (finding the subsequent agency action implementing an earlier decision was nevertheless final because it had "practical and legal effects" on the permittee's "day-

[14] Indeed, BLM candidly admitted months before issuing the LNTPs that "an inventory for TCPs has not been completed at this time." ER_68.

to-day business"). The PA prohibits BLM from issuing an LNTP until after it has complied with its duty, consistent with the NHPA, to ensure that construction "will not restrict subsequent measures to avoid, minimize or mitigate the adverse effects to historic properties through rerouting of the corridor." ER_109; ER_65 ¶ 78. Moreover, the LNTPs—not the ROD or ROW—bind Intervenor to measures and conditions developed *after* the ROD that are required to comply with the NHPA (i.e., measures that were not known at the time BLM issued the ROD or ROW). ER_65 ¶ 78.

When viewed in the proper context, it is thus clear that the LNTPs are by design BLM's final (and only) determination that the NHPA has been satisfied for this Project and that construction in the Valley may proceed, especially where BLM could have ensured NHPA compliance before issuing the ROD but chose instead to defer satisfaction of that legal duty until later. *ONDA*, 465 F.3d at 989.

In reaching a contrary conclusion, the district court held that the LNTPs were not a final agency action because the 2015 ROD "approved the project route," while the LNTPs "simply indicated that all pre-construction conditions were met." ER_7.

However, by holding that the issuance of a ROD documenting the agency's decisions under NEPA set the Project route in stone—even though the ROD itself *expressly deferred* the NHPA process and compliance with that law until after the ROD—the district court's approach effectively precludes any review of whether BLM adequately considered measures to avoid, minimize, or mitigate effects even to newly

identified cultural resources by realigning the route, notwithstanding BLM's *distinct* obligations under the NHPA. In other words, under the ruling below, once the ROD is issued, BLM's NHPA obligations are effectively subordinate to BLM's NEPA obligations. But there is no legal support for this facially illogical proposition, which would permit BLM to insulate itself from its legal duties by delaying its NHPA obligations for over six years. To the contrary, as this Court has repeatedly recognized, "an agency cannot escape its obligation to comply with [one statute] merely because it is bound to comply with another statute that has consistent, complementary objectives." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 640 (citation and internal quotation marks omitted).

The district court is also wrong that the issuance of the LNTPs "simply indicated that all pre-construction conditions were met." ER_7. Far from "ministerial acts," the "pre-construction conditions" listed in the PA, ROD, and ROW comprise a discretionary exercise through which BLM may not issue an LNTP unless it determines that the Project's impacts on historic properties have been fully considered and resolved. Indeed, the PA made clear that BLM retained discretion to issue LNTPs, and could do so *only* if it found, in compliance with the NHPA, that "such authorizations will not restrict . . . measures to avoid, minimize, or mitigate the adverse effects to historic properties through rerouting of the corridor." ER_65; ER_109; *see also* 43 C.F.R. § 2807.10 (stating that "you may not initiate construction" under a ROW grant "until BLM issues you a [n]otice to proceed"); *Hammond v Norton*,

370 F. Supp. 2d 226, 256 (D.D.C. 2005) (noting that BLM's actions in issuing an LNTP "are not 'purely ministerial' because BLM still retains discretion to halt the [project] should [the applicant] not meet its [legal] obligations").

Put simply, the LNTPs are final agency actions under *Bennett* and constitute the only BLM actions that can serve as the focal point for judicial review of Plaintiffs' NHPA claims under the facts of this case.

### D. <u>The District Court's Ruling That Plaintiffs' Claims Are Untimely Is Contrary To Circuit Precedent</u>

According to the district court's decision, the issuance of a ROD triggers a plaintiff's sole opportunity to challenge BLM's NHPA compliance "because the remedy sought—relocation of the route—would require setting aside the 2015 ROD final agency decision." ER_8. That position is foreclosed by binding precedent. Controlling authority, not to mention logic and basic fairness, strongly support the conclusion that the LNTPs triggered judicial review of Plaintiffs' NHPA claims.

As an initial matter, the district court misconstrues Plaintiffs' requested relief. Plaintiffs do *not* seek "relocation of the project route." *Id.* The NHPA is a procedural statute. Plaintiffs merely ask the Court to order BLM to comply with the statutorily mandated process; the outcome of that yet-to-occur process is not before the Court. Indeed, this Court has rejected the argument that claims arising from subsequent final agency actions are barred merely because the requested relief could, after further process, potentially "interfere with activities specifically authorized by" an earlier

agency decision. *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1159-60 (9th Cir. 2012). Hence, if Plaintiffs prevail here, "the remedy would be an injunction [or vacatur] against [BLM] . . . to perform a full [NHPA] analysis of the proposed action"; such remedy would have no immediate effect on the ROD or ROW because "[t]he sufficiency of the hypothetical [NHPA process] is not before us, nor was it before the district court." *Id.* at 1160 (emphasis added).

Additionally, the district court's ruling impermissibly "transform[ed]" the APA's finality requirement "from a provision designed to remove obstacles to judicial review of agency action, into a trap for unwary litigants." *Darby v. Cisneros*, 509 U.S. 137, 147 (1993) (cleaned up). Under the district court's ruling, after the statute of limitations period has run on the initial decision approving a project, challenges to the agency's NHPA compliance would be automatically barred as untimely, regardless of whether subsequent, final agency decisions threaten to irreparably injure a plaintiff's cognizable interests in historic properties. The ruling below thus erroneously allows agencies to insulate their historic preservation decisions from legal challenge by subjecting those decisions to judicial review only upon the project's initial approval, despite the fact that agencies routinely choose to defer NHPA compliance until *after* the initial decision under NEPA or other laws, sometimes for many years.

The ruling below thus creates an impossible game in which the agency, having the best sense of its own funding, priorities, and management, holds all the cards. And if Plaintiffs had filed suit challenging the ROD in 2015—before BLM completed its

NHPA obligations—Circuit precedent would have required *dismissal* as unripe or lacking final agency action. *See N. Cheyenne Tribe* 503 F.3d at 845-46. Thus, in cases where an agency takes more than six years between issuing its ROD and its LNTP, as here, the ruling below places Plaintiffs in an untenable Catch-22.

Likewise, in *California Sea Urchin Commission v. Bean*, this Court found that "the operative agency action" was the later "*decision* to terminate [a] program" and not an earlier decision granting "the *authority* to terminate the program," and therefore the suit was not time-barred. 828 F.3d 1046, 1049-52 (9th Cir. 2016). The Court reasoned that while the earlier decision notified the public that the agency "*may* at some later date terminate the program, the operative agency action did not happen until 2012, when [the agency] *actually* terminated the program." *Id.* at 1050. The ruling was "supported by pragmatic concerns." *Id.* at 1051-52. If the earlier decision was the linchpin for judicial review, any suit within six years of that decision "would necessarily have been theoretical," i.e., unripe. *Id.* at 1052. By the same token, where "the operative dispute does not arise" until after the statute of limitations period on the earlier action has run, "backdating the action to when the agency first published an applicable or controlling rule" would later "wall off the agency from any challenge on the merits." *Id.* at 1051; *see also Snoqualmie Valley,* 683 F.3d at 1159 (finding plaintiffs timely pursued claim where the relevant agency action had not yet occurred "during [prior] judicial review" of a different agency action for that project, and thus "could not have been raised" previously).

The same result is required here. Although the 2015 ROD (and PA) "laid out the criteria" that BLM would have to meet to comply with its NHPA obligations, Plaintiffs' "live dispute" with BLM only arose *once* the agency purported (and failed) to "apply the . . . criteria" and *actually complete* Section 106 consultation with respect to the Valley. *Cal. Sea Urchin*, 828 F.3d at 1051-52. Plaintiffs plausibly alleged—indeed, it is beyond dispute—that BLM did not conclude its NHPA process until *after* it issued the 2015 ROD. Rather, the LNTPs communicated, for the *first* time, BLM's unequivocal determination that Project construction in the Valley would not affect any TCPs.

In deciding whether to approve construction in the Valley, the NHPA (and the PA) obligated BLM to do more than simply adopt its decision *under NEPA*. Thus, the LNTPs do not merely "rubber-stamp" the decision made in the 2015 ROD. *Cf. Ctr. for Biological Diversity v. U.S. EPA*, 847 F.3d 1075, 1093 (9th Cir. 2017) (rejecting argument that challenge to a pesticide *re*-registration impermissibly challenged the earlier initial registration because the re-registration "incorporates data not available during the process for issuing [an initial registration], and necessarily involves a determination distinct from those made during the [initial] process"). BLM "may well defend" its NHPA compliance as embodied by the LNTPs "as a straightforward application of the [2015 ROD], but that application"—again, as communicated through the LNTPs—"was nonetheless a final agency action, with its own limitations period beginning in" 2023. *Cal. Sea Urchin*, 828 F.3d at 1051.

In sum, under the ruling below, the statute of limitations "cease[s] to be a shield against stale claims," and "instead become[s] a sword to vanquish a challenge . . . without ever considering the merits." *Id.* While the 2015 ROD addressed BLM's NEPA compliance, only later did BLM purport to resolve its *NHPA* compliance, culminating in BLM's authorization of construction shortly before Plaintiffs filed suit. In practical terms, BLM told Plaintiffs during the NEPA process that it was too early to challenge the agency's compliance with the NHPA, only to turn around later and say it is now too late. This *"heads, I win; tails, you lose"* approach—an all too familiar refrain for Tribes throughout the nation's history—must be rejected.

## IV. PLAINTIFFS' COMPLAINT PLAUSIBLY ALLEGES BLM FAILED TO ABIDE BY THE TERMS OF THE PA

The ruling below dismissed Plaintiffs' Complaint on the grounds—thoroughly rebutted above—that its NHPA claims were untimely. However, the district court's perfunctory footnote supplies an alternative reason for dismissal, i.e., that Plaintiffs "do not plausibly allege that the BLM failed to comply with the PA." ER_7 n.9. This finding is legally and factually wrong.

As an initial matter, the district court appears to rest its determination as to the *legal sufficiency* of the Complaint on its finding in its order on Plaintiffs' motion for a preliminary injunction that "Plaintiffs were unlikely to succeed on the merits." *Id.* But a plaintiff seeking injunctive relief has a much "heavier burden" than she "bears in pleading the plausible claim necessary to avoid dismissal." *New Hope Family Servs., Inc.*

*v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020); *see also B&L Prods.*, 104 F.4th at 112 & n.5. To obtain a preliminary injunction, a plaintiff must make a "clear showing" that she is entitled to relief. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023). In contrast, Rule 12(b)(6)'s "plausibility" standard requires only that the complaint contains sufficient factual matter, accepted as true, to find "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Hence, again, to the extent the district court's ruling on the motions to dismiss relied upon the preliminary injunction record and any factual findings made on the basis of that evidence, such reliance is improper and an abuse of discretion. Notably, the "plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. Thus, in opposing the motions to dismiss, Plaintiffs were not required to prove that BLM violated the NHPA and the PA; they simply had to establish that the allegations in the Complaint are sufficient to render their claims plausible. *Tadros v. Wilmington Trust, Nat'l Ass'n*, No. 17-cv-1623, 2018 WL 2248453, at *2 (D. Or. May 15, 2018) (explaining that "[w]hen a motion to dismiss is filed after a preliminary injunction dispute, the court has two choices": either proceed under Rule 12(b)(6) and "ignore the evidence in the preliminary injunction record (as well as any findings made on the basis of that evidence)"; or, "with notice to the parties," convert the motion to dismiss into a motion for summary judgment and "consider the evidence in the preliminary injunction record").

Applying the appropriate standard, it is clear that Plaintiffs' Complaint at the very least articulated a *plausible* claim that BLM failed to comply with the PA. For example, Plaintiffs allege that the PA requires BLM to consider the "values expressed by" Tribes when identifying historic properties. ER_63. However, as alleged, BLM repeatedly ignored detailed information alerting BLM to a likely TCP in the Valley. ER_58-61; ER_69. Plaintiffs also allege that the PA requires BLM to *consider* avoiding historic properties, including by "realignment of the transmission line." ER_65. Yet, BLM refused to consider measures to avoid likely TCPs in the Valley. ER_86-88.

As alleged, the PA further precludes BLM from issuing *any* notice to proceed that will "restrict subsequent measures to avoid, minimize or mitigate" adverse effects to historic properties "through rerouting of the corridor." ER_65. But the 2023 LNTPs challenged here authorized construction activities that "effectively foreclosed consideration" of such measures. ER_82-83.

Finally, as alleged, through the LNTPs, BLM authorized activities that "adversely affected historic properties, including [TCPs] and cultural landscapes, prior to the completion of the . . . consultation processes required by the NHPA, its implementing regulations, *and the [PA]*." ER_83 (emphasis added). Taking these facts as true and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs plausibly alleged that BLM failed to follow the PA's procedures, including by ignoring Tribal values and concerns when identifying and evaluating historic properties, failing to take legally required steps to identify TCPs including cultural landscapes, failing to consider

measures to avoid TCPs, and issuing LNTPs that restrict consideration of such measures prior to concluding the Section 106 process.

The ruling below conveniently overlooks perhaps the most salient allegations relating to BLM's alleged failure to carry out the PA's terms: that Plaintiffs have *repeatedly and specifically* informed BLM of its failure to comply with the PA's requirements. For example, in their attempts to resolve their disputes short of litigation, Plaintiffs informed BLM that its decision to issue the LNTPs contravened the PA's stipulation requiring BLM to consider avoiding historic properties, including by "realignment of the transmission line," and requested that BLM "prioritize the avoidance" of "adverse effects to historic properties, especially [TCPs] and cultural landscapes, in accordance with the NHPA, its implementing regulations, and the [PA]." ER_79-81. Faced with BLM's refusal to do so, Plaintiffs filed their Complaint reiterating those same, longstanding concerns.

In view of this history as alleged in the Complaint, BLM cannot say in good faith that it lacked "fair notice" of its alleged misconduct. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (requiring that pleadings contain "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"). Rather, Plaintiffs' allegations are more than sufficient at this stage of the litigation to notify BLM of the claims against it and to allow the agency to prepare an adequate defense. *See Navarro*, 250 F.3d at 732 (explaining that dismissal under Rule 12(b)(6) "is proper *only* where there is no cognizable legal theory or an absence of

sufficient facts alleged to support a cognizable legal theory" (emphasis added) (citing *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988))).

Finally, notwithstanding the fact that Plaintiffs' Complaint makes more than sufficient factual allegations to support their claims for relief at the pleading stage, the district court's cursory footnote dismissing those claims ignores Plaintiffs' request that they be granted the opportunity to amend their Complaint under Rule 15. Under that rule, "[a] district court shall grant leave to amend [a pleading] freely," and this policy is "to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (cleaned up). As this Court has repeatedly stressed, "[d]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008) (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998)). Although the district court retains discretion to deny leave to amend, "[a]n outright refusal to grant leave to amend without a justifying reason is . . . an abuse of discretion." *Id.* (quoting *Leadsinger, Inc. v. BMG Music Publ'g.*, 512 F.3d 522, 532 (9th Cir. 2008)).

Assuming *arguendo* that Plaintiffs' Complaint fails to support their claims for relief at the pleading stage—a finding that is unfounded in law or fact—such a defect can easily be remedied by granting Plaintiffs leave to amend their pleading. However, the ruling below broadly declares that "[t]he defects identified in this Order cannot be cured by amendment." ER_8. The district court did not explain why this *particular*

defect—i.e., that Plaintiffs failed to "plausibly allege that the BLM failed to comply with the PA," ER_7 n.9—could not be saved by amendment, despite the fact that such an omission is easily curable. Thus, to the extent that the ruling below dismisses Plaintiffs' request for leave to amend without providing a "justifying reason," the district court abused its discretion. *Manzarek*, 519 F.3d at 1034.

## CONCLUSION

For all of these reasons, the Court should reverse the ruling below and remand the case to the district court for resolution of the merits.

Respectfully submitted,

*/s/ Howard Shanker*
Howard Shanker, Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
(520) 383-3410

*Counsel for the Tohono O'odham Nation*

*/s/ Alexander B. Ritchie*
Alexander B. Ritchie, Attorney General
Bernardo M. Velasco, Asst. Attorney General
SAN CARLOS APACHE TRIBE
P.O. Box 40
San Carlos, AZ 85550
alex.ritchie@scat-nsn.gov
bern.velasco@scat-nsn.gov
(928) 475-3344

*Counsel for the San Carlos Apache Tribe*

*/s/ William S. Eubanks II*
William S. Eubanks II
Elizabeth L. Lewis
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
bill@eubankslegal.com
lizzie@eubankslegal.com
(202) 618-1007

*Counsel for Center for Biological Diversity and Archaeology Southwest*

## CERTIFICATE OF COMPLIANCE

This brief complies with the requirements of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1(a) because it has 12,298 words, excluding the items exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

/s/ William S. Eubanks II
William S. Eubanks II