No. 24-3659

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

TOHONO O'ODHAM NATION, et al.,
*Plaintiffs–Appellants*,

v.

U.S. DEPARTMENT OF THE INTERIOR, et al.,
*Defendants–Appellees*,

and

SUNZIA TRANSMISSION, LLC,
*Intervenor–Appellee*.

Appeal from the U.S. District Court for the District of Arizona
No. 4:24-cv-34 (Hon. Jennifer G. Zipps)

# APPELLEES' ANSWERING BRIEF

TODD KIM
*Assistant Attorney General*

ANDREW M. BERNIE
AMBER DUTTON-BYNUM
DEVON LEHMAN MCCUNE
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

Of Counsel:

MICHAEL SMITH
BENJAMIN VACCARO
*Attorneys*
Office of the Solicitor
U.S. Department of the Interior

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

GLOSSARY ..... vii

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 2

STATEMENT OF THE ISSUES ..... 3

STATEMENT OF THE CASE ..... 3

A. The National Historic Preservation Act ..... 3

B. The SunZia Transmission Line and the 2015 Record of Decision ..... 6

C. Interior's post-2015 compliance with the NHPA Programmatic Agreement ..... 12

D. Plaintiffs' complaint ..... 19

E. The district court's denial of Plaintiffs' motion for a preliminary injunction and this Court's denial of an injunction pending appeal ..... 22

F. The district court's dismissal ..... 24

SUMMARY OF ARGUMENT ..... 25

STANDARD OF REVIEW ..... 29

ARGUMENT ..... 30

I. Any challenge to the 2015 ROD, the Programmatic Agreement, or the Project route is time-barred. ..... 30

A. Plaintiffs challenged the Project route and sought vacatur of the underlying authorization of the Project. .... 31

B. Any challenge to the ROD or the Programmatic Agreement is time-barred because Plaintiffs' injury first occurred in 2015, concurrent with final agency action. .... 36

II. The district court correctly dismissed any remaining claim because Plaintiffs have not plausibly alleged that Interior failed to meet its ongoing NHPA obligations. .... 43

A. Interior's NHPA obligations are governed by the Programmatic Agreement, and Plaintiffs have not plausibly alleged that Interior has breached any terms in the Programmatic Agreement. .... 44

B. Plaintiffs have not identified a final agency action to support their arguments about ongoing NHPA compliance. .... 51

III. The district court did not err in relying on documents beyond the complaint, and any error by the district court is irrelevant because this Court's review is de novo. .... 58

CONCLUSION .... 61

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Ariz. All. for Cmty. Health Ctrs. v. Ariz. Health Care Cost Containment Sys.*,
47 F.4th 992 (9th Cir. 2022) .......... 59

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 44, 50

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 44, 46

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 52

*California Sea Urchin Commission v. Bean*,
828 F.3d 1046 (9th Cir. 2016) .......... 55

*Corner Post, Inc. v. Bd. of Governers of the Fed. Reserve*,
603 U.S. ___, 144 S. Ct. 2440 (2024) .......... 36, 38, 40, 56, 57

*Ctr. for Biological Diversity v. Esper*,
958 F.3d 895 (9th Cir. 2020) .......... 29

*Dennis v. BEH-1, LLC*,
520 F.3d 1066 (9th Cir. 2008) .......... 42

*Doe v. United States*,
58 F.3d 494 (9th Cir. 1995) .......... 60

*Green v. Brennan*,
578 U.S. 547 (2016) .......... 40, 56

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) .......... 60

*Moreland v. Las Vegas Metro. Police Dep't*,
159 F.3d 365 (9th Cir. 1998) .......... 60

*Northern Cheyenne Tribe v. Norton*,
503 F.3d 836 (9th Cir. 2007) ........................................................ 54, 55

*Norton v. S. Utah Wilderness, All.*, 542 U.S. 55 (2004) ........................................................ 51

*Palm v. L.A. Dep't of Water & Power*,
889 F.3d 1081 (9th Cir. 2018) ........................................................ 29

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ........................................................ 30

*Pres. Coal. Inc. v. Pierce*,
667 F.2d 851 (9th Cir. 1982) ........................................................ 4

*Rattlesnake Coal. v. U.S. Envtl. Prot. Agency*,
509 F.3d 1095 (9th Cir. 2007) ........................................................ 29

*San Carlos Apache Tribe v. United States*,
417 F.3d 1091 (9th Cir. 2007) ........................................................ 4, 29

*Shwarz v. United States*,
234 F.3d 428 (9th Cir. 2000) ........................................................ 44

*Snoqualmie Indian Tribe v. FERC*,
545 F.3d 1207 (9th Cir. 2008) ........................................................ 5, 44

*Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Engineers*,
683 F.3d 1155 (9th Cir. 2012) ........................................................ 55

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ........................................................ 3

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
672 F.3d 1160 (9th Cir. 2012) ........................................................ 43

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........................................................ 59

## Statutes

5 U.S.C. § 702 ........ 36, 51

5 U.S.C. § 704 ........ 43, 51, 52

5 U.S.C. § 706(1) ........ 51

5 U.S.C. § 706(2) ........ 51, 57

5 U.S.C. § 706(2)(A) ........ 30

28 U.S.C. § 1291 ........ 2

28 U.S.C. § 1331 ........ 2

28 U.S.C. § 2401(a) ........ 22, 25, 36, 40, 42

43 U.S.C. § 1761(a)(4) ........ 6

54 U.S.C. § 300320 ........ 3, 53

54 U.S.C. § 306108 ........ 3

54 U.S.C. § 306114 ........ 5, 45

## Regulations and Federal Register Notices

33 C.F.R. § 148.276 ........ 41

36 C.F.R. Part 800 ........ 4

36 C.F.R. § 800.14 ........ 54

36 C.F.R. § 800.14(b)(1) ........ 5

36 C.F.R. § 800.16(*l*)(1) ........ 4

36 C.F.R. § 800.3(a) ........ 4

36 C.F.R. § 800.4(b)(1) ........ 45

36 C.F.R. § 800.4(b)(2) ........ 9

36 C.F.R. § 800.6 .......................................................................... 5

36 C.F.R. § 800.6(c) .................................................................... 6, 45

43 C.F.R. § 2805.13 ..................................................................... 52

43 C.F.R. § 2807.10 ..................................................................... 41

43 C.F.R. § 2807.10 ..................................................................... 52

43 C.F.R. § 2805.10(b)(2) ............................................................ 52

86 Fed. Reg. 30,066 ..................................................................... 14

## GLOSSARY

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APA | Administrative Procedure Act |
| ASW | Archaeology Southwest |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| HPTP | Historic Properties Treatment Plan |
| LNTP | Limited Notice to Proceed |
| NHPA | National Historic Preservation Act |
| ROD | Record of Decision |
| SHPO | State Historic Preservation Office |
| TCP | Traditional Cultural Property |

## INTRODUCTION

Plaintiffs challenge the U.S. Department of the Interior's (Interior) decision to approve the route for a transmission line in Southern Arizona that would carry power from wind farms in New Mexico to residents of Arizona and California. Specifically, they argue that Interior's approval of the route violates the National Historic Preservation Act (NHPA) because the route goes through the San Pedro Valley, and the entire valley (according to Plaintiffs) is a Traditional Cultural Property (TCP). But Interior set the Project's final route in 2015, eight years before Plaintiffs filed suit, and if Plaintiffs suffered an injury from the route, they suffered it then. Any challenge to the Project approval or the Project route is time-barred by the six-year statute of limitations. While it is not entirely clear whether Plaintiffs still challenge the route in their opening brief, they appear to incorrectly argue that the statute of limitations does not apply here.

It also appears that Plaintiffs argue that Interior has violated its *ongoing* obligations under the NHPA and the Programmatic Agreement implementing the NHPA for this project. But the complaint fails to state a claim for such a violation, both legally and factually. Plaintiffs

have not alleged that Interior violated any specific provision of the Programmatic Agreement, and in any event, Interior has not violated any provisions. As the allegations in the complaint make clear, Interior consulted with Plaintiffs about the cultural properties in the Valley both before and after approving the 2015 ROD and, consistent with the Programmatic Agreement, explicitly asked Plaintiffs for comments on its cultural inventory reports, which identify all the historic properties for which Interior would develop a treatment plan.

Plaintiffs are time-barred from challenging the underlying Project authorization and, to the extent they now challenge Interior's ongoing compliance with the NHPA, they fail to state a claim. This Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiffs sued under the NHPA and Administrative Procedure Act (APA), so the district court had jurisdiction under 28 U.S.C. § 1331. The district court dismissed the entire action with prejudice and directed the clerk of court to close the case on June 6, 2024. ER-009. Plaintiffs timely filed a notice of appeal on June 11, 2024. ER-177. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs' challenge to a 2015 decision setting the route for a transmission-line corridor is time-barred by the six-year statute of limitations.

2. Whether Plaintiffs plausibly allege that Interior has failed to meet its ongoing obligations under the Programmatic Agreement.

## STATEMENT OF THE CASE

### A. The National Historic Preservation Act

The NHPA is a procedural statute that requires federal agencies to "stop, look and listen" and to consider the effects of their undertakings on historic properties. *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010). Section 106 of the NHPA requires federal agencies to "take into account the effect of [any] undertaking on any historic property." 54 U.S.C. § 306108.[1] Section 106 does not prohibit harm to historic properties, which are defined in the statute as properties eligible for or included on the National Register of Historic Places. *Id.* § 300308. Instead, the

[1] An "Undertaking" is a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 54 U.S.C. § 300320.

NHPA creates obligations that are "chiefly procedural in nature." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2007) (quoting *Pres. Coal. Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982)).

The Advisory Council on Historic Preservation (ACHP) has promulgated regulations that explain how federal agencies can comply with § 106. *See* 36 C.F.R. Part 800. The regulations define "historic properties" subject to § 106 to include "properties of traditional religious and cultural importance to an Indian Tribe" that meet the criteria for inclusion in the National Register of Historic Places. 36 C.F.R. § 800.16(*l*)(1). These properties are known as "Traditional Cultural Properties" (TCPs).

Section 106 consultation proceeds in four steps. First, the relevant federal agency initiates consultation. 36 C.F.R. § 800.3(a). Second, the agency identifies, through reasonable and good-faith efforts, historic properties that the undertaking will potentially affect and evaluates those resources for their eligibility for listing on the National Register. *Id.* § 800.4(a)–(d). Third, the agency assesses whether the undertaking would have adverse effects on any historic properties. *Id.* § 800.5. And

fourth, if the agency determines that any historic properties would suffer adverse effects, it must evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects. *Id.* § 800.6. During all four steps, the agency consults with parties that have an interest in the effects of the undertaking, such as the ACHP, state historic preservation offices (SHPOs), and Tribes. *Id.* § 800.1(a).

The ACHP's regulations also allow agencies to adopt a programmatic agreement "to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." 36 C.F.R. § 800.14(b)(1), (3) (listing examples of when an agency may use a programmatic agreement and explaining that consultation to develop a programmatic agreement for dealing with potential adverse effects of complex projects shall follow 36 C.F.R. § 800.6). An executed programmatic agreement "shall govern the undertaking and all of its parts." 54 U.S.C. § 306114. When an agency executes a programmatic agreement under the NHPA, it "closes the record" for the purposes of § 106. *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1216 (9th Cir. 2008). At that point, compliance with the procedures established by the programmatic agreement

satisfies the agency's § 106 responsibilities for an undertaking. 36 C.F.R. § 800.6(c).

### B. The SunZia Transmission Line and the 2015 Record of Decision

In 2008, SunZia Transmission, LLC applied for a right-of way over lands owned by the United States and managed by the Bureau of Land Management (BLM). ER-132. SunZia sought the right-of-way to construct, operate, and maintain an approximately 520-mile transmission line in New Mexico and Arizona, 183 miles of which would cross BLM-managed land. ER-132; *see* 43 U.S.C. § 1761(a)(4). The transmission line would carry up to 4,500 megawatts of clean energy from wind farms in New Mexico to markets in Arizona and California, which would increase available transfer capacity in an electrical grid that is currently insufficient to support the development, access, and transport of additional energy generating resources, including renewable energy. ER-132–34. Although the 520-mile corridor runs through federal, state, and private lands, this litigation involves only the portion of the corridor that runs through the San Pedro Valley, northeast of Tucson. ER-034. None of the lands in this San Pedro Valley route segment are managed by the BLM or any other federal agency.

*See* ER-146 (explaining that, for the 161.2-mile route segment that includes the San Pedro Valley, only 10.8 miles are on BLM-managed land, none of which are in the San Pedro Valley).

After Interior received SunZia's application, it initiated its environmental-review process under the National Environmental Policy Act, publishing a notice of intent to prepare an Environmental Impact Statement (EIS). ER-132. Interior published the Draft EIS in 2012 and published the Final EIS in 2013. ER-130.

Interior involved the Plaintiffs Tohono O'odham Nation and San Carlos Apache Tribe in the preparation of the EIS long before it issued the Final EIS; concurrent with the environmental-review process, Interior consulted with Plaintiff Tribes under § 106. ER-166. Interior initiated § 106 consultation in 2009 and identified Plaintiff Tribes and Plaintiff Archaeology Southwest (ASW) as consulting parties ER-166. Plaintiff Tohono O'odham Nation, Plaintiff San Carlos Apache Tribe, and Plaintiff ASW all actively participated in the § 106 process as consulting parties for nearly six years before Interior issued its decision in January 2015. ER-168.

The § 106 process began with the first identification of historic properties in the Project area, or the Class I inventory. ER-166. In the Class I inventory, Interior reviewed existing information about historic properties and identified gaps in field-inventory coverage in New Mexico and Arizona. ER-166. To supplement the Class I inventory, Interior also conducted a Class II inventory, in which it surveyed areas where cultural resources were likely to occur, especially spots where the Project would cross rivers and historic trails. ER-166–67. That information provided an indication of cultural resource density and informed the selection of the Project route. ER-167. The Class II inventory included a site visit to the San Pedro Valley, which the Tribal Historic Preservation Officer from the Tohono O'odham Nation attended. SER-53. At the site visit, no Tribe identified the entire San Pedro Valley as a TCP.

Indeed, Plaintiffs never identified the San Pedro Valley as a TCP during the entire period leading to the January 2015 decision. In their comments on the draft EIS, the San Carlos Apache Tribe stated generally that it opposed the then-proposed route because of the potential impacts on culturally sensitive and sacred areas to the tribe

and urged Interior to select a route that went through Tucson. ER-59–60. But its comments did not state that the entire San Pedro Valley should be identified as a TCP for § 106 purposes, let alone provide information that would justify such a finding. ER-59–60. Interior explained in its response that its preferred route would cross the San Pedro River at the same location as the Tribe's preferred route, within an existing transmission-line corridor, and that construction would avoid the majority of known cultural-resource sites in the area. SER-3–6. Similarly, neither ASW nor the Tohono O'odham Nation identified the San Pedro Valley as a TCP in their comments. ER-58–59.

Due to the scope of the Project, and in accordance with 36 C.F.R. § 800.4(b)(2), Interior entered into a Programmatic Agreement in 2014 that would govern its compliance with § 106. ER-164 ("Compliance with the procedures in the [Programmatic Agreement] will represent satisfaction of the agency's Section 106 responsibilities."); ER-96–123. The Programmatic Agreement was the result of a years-long consultation with the ACHP, SHPOs, Tribes, and other consulting parties. ER-164. Under the Programmatic Agreement, consistent with ACHP regulations, the further identification and evaluation of historic

properties would take place after Interior issued the ROD but before construction. ER-167.

The Programmatic Agreement laid out a process by which Interior would develop an inventory of historic properties in the Project area, present that inventory to the consulting parties (including Plaintiffs) for comment, and work to mitigate the Project's effects on those identified historic properties. ER-100–108. The cultural resources inventory would include results from the Class I survey and Class III intensive field surveys; recommendations for whether certain resources were eligible for inclusion in the National Register of Historic Places; and assessments of direct, indirect, and cumulative effects on those resources. ER-101. The Programmatic Agreement required Interior to provide the Tribes with the inventory report for a 60-day review period, specifically so that Tribes could comment on "[w]hether there are any properties of traditional cultural or religious importance to tribes and ethnic groups that were not identified in the inventory and that may be affected by the undertaking." ER-101. Then, Interior would ensure that those comments were incorporated into the revised inventory report, before resubmitting the report to the Tribes and consulting parties for

another 60-day review. ER-101–02. Once the inventory report was finalized, the Programmatic Agreement provided that the report would serve as the definitive inventory for historic properties in the Project area (except for previously unknown properties discovered during future construction) and would serve as the basis for the preparation of the Historic Properties Treatment Plan (HPTP), which would address potential effects from construction and how to mitigate those effects. ER-102–14.

The Programmatic Agreement was signed by, among others, Interior, SunZia, the ACHP, and the SHPOs. SER-8–12. The Tohono O'odham Nation and the San Carlos Apache Tribe declined to sign the Programmatic Agreement despite being invited to do so (the Tribes' signatures were not required for the Agreement to go into effect). SER-13–14. Plaintiff ASW signed the Programmatic Agreement as a consulting party. SER-15. The Programmatic Agreement went into effect on December 17, 2014. ER-164.

In January 2015, Interior signed the ROD documenting its decision to issue a right-of-way for the transmission line and associated facilities on the portion of the Project on BLM-managed land. ER-136–

37. The ROD set forth the path of the right-of-way in detail, including a map of the route. ER-147–50, SER-7.[2] The ROD explained that it finalized the specific route on the map, which included the right-of-way through San Pedro Valley. ER-137 ("[A] right-of-way will be granted . . . following the route of the BLM Selected Alternative (subroutes 1A2, 3A2, and 4C2c) as shown in [the map on page 5 of the ROD]."). The ROD also explained that it was Interior's "final decision" and that any challenge to the decision, including a challenge to the right-of-way grant, "must be brought in the Federal District Court." ER-125. The ROD did not authorize SunZia to begin construction on the Project, which could not commence until SunZia received a written notice to proceed that confirmed that all pre-construction conditions had been met. ER-137, 167.

### C. Interior's post-2015 compliance with the NHPA Programmatic Agreement

After it signed the ROD, Interior continued complying with its § 106 obligations as prescribed by the Programmatic Agreement. In 2017 and 2018, a contractor conducted Class III surveys, which

[2] The map is included in the ROD but was omitted from Plaintiffs' excerpts of record. It appears at page 5 of the ROD. SER-7.

included pedestrian surveys of the area of potential effect along the entire Project route. SER-25–28; SER-72–75.[3] These findings were published in a draft cultural resource inventory report and distributed to the consulting parties, including the Plaintiff Tribes, for comment. SER-75–76. Specifically, the letter transmitting the reports requested comments about "whether there are any properties of traditional cultural or religious importance to the tribes." SER-56–58. Plaintiffs did not comment on or suggest any unidentified TCPs. SER-57–58; SER-75–76. Interior provided Plaintiffs with a revised inventory report and then finalized the report in July 2018. SER-56. As required by the Programmatic Agreement, the state SHPOs concurred in the inventory list. SER-16–17. Thus, under the Programmatic Agreement, the inventory list then governed Interior's compliance with the remaining provisions of the Programmatic Agreement that address evaluation and resolution of adverse effects on historic properties. ER-100–02.

In 2018, Interior also prepared and distributed for review an addendum Class III inventory report and a separate inventory report for the Project's visual-effects assessment. SER-56–58. This gave the

[3] The PA defines the areas of potential effect at ER-99–100.

Tribes further opportunities to identify resources not otherwise identified through the survey process. The Tribes again did not suggest that the entire San Pedro Valley could be a TCP. SER-57–59.[4] In 2019, Interior and the consulting parties began to develop a Historic Properties Treatment Plan that would resolve effects on previously identified historic properties. SER-60.

In March 2023, more than eight years after Interior issued the ROD approving the transmission-line route, the Plaintiff Tribes sent letters to Interior alleging that the middle San Pedro Valley is a TCP for the first time and requesting the "thorough re-consideration of the alternative routes." SER-30. Interior met with the consulting parties, including the Tohono O'odham Nation and the San Carlos Apache

---

[4] In 2020, SunZia applied to amend the right-of-way grant. *See Notice of Intent to Prepare an Environmental Impact Statement and Resource Management Plan Amendments for the SunZia Southwest Transmission Project, New Mexico*, 86 Fed. Reg. 30,066 (June 4, 2021). The only amendment relevant to the San Pedro Valley was the addition of a right-of-way for access roads and temporary work areas; the amendment did not modify the transmission line's route through the San Pedro Valley. SER-23. Interior prepared a new EIS to address the environmental effects of the proposed changes, but the EIS did not revisit or reanalyze the previously analyzed and approved route from 2015 unless conditions had changed that warranted new analysis. SER-20. Interior then issued a ROD in 2023 approving the amendment. Plaintiffs do not challenge Interior's 2023 ROD.

Tribe, on April 13, 2023, to discuss Interior's implementation of the Programmatic Agreement. SER-79. In that meeting, Interior explained that the Tribes had not provided sufficient information to demonstrate whether the San Pedro Valley was a TCP and to analyze the impacts on the Valley as a TCP. SER-79.

On April 26, 2023, the BLM New Mexico State Director called the chairmen of both Tribes but was unable to speak with them—the Tribes did not respond to the State Director's phone calls or messages. SER-86. On June 30, 2023, the BLM Director sent official responses to the Tribes. These letters explained that Interior evaluated different routing options for the transmission line in 2012 through 2015, and that the 2015 ROD memorialized that decision. SER-34–36. The letter explained that the Programmatic Agreement does not allow Interior to reroute the transmission line that it approved in 2015, particularly because the section of the transmission line in the San Pedro Valley is on nonfederal land. SER-34–36. And the letter noted that, since 2018, the Plaintiffs had been "provided detailed cultural resource inventory reports and invited to comment and provide information on those reports." ER-74.

On August 4, 2023, the Plaintiff Tribes and ASW invoked the dispute resolution procedure in the Programmatic Agreement. Once again, Interior attempted to contact both Tribes but did not receive a response. SER-87. On September 13, 2023, Interior again reached out to the chairmen of the Tribes, inquiring about their interest in a meeting. Again, Interior received no response. SER-87. The BLM New Mexico State Director called both Tribes again and left messages, but once again received no response. SER-87. On September 27, the State Director sent separate emails to Plaintiffs again seeking to discuss the Project and their invocation of the Programmatic Agreement dispute-resolution process; yet again, Plaintiffs did not respond. SER-88.

Having received no contact from the disputing parties since August 4 despite repeated attempts to contact them, Interior issued a Limited Notice to Proceed (LNTP) for construction in portions of the San Pedro Valley on September 28, 2023. SER-88. The LNTP indicated that all preconstruction conditions had been met and authorized SunZia to begin ground-disturbing activities for construction in the San Pedro Valley. On October 31, 2023, the Tohono O'odham Nation wrote directly to Secretary of the Interior Haaland requesting that Interior withdraw

or suspend authorization of the LNTP for the Arizona portion of the Project. SER-88–89.

On November 8, 2023, to provide the Tribes yet more time to respond, Interior ordered an immediate temporary suspension of the LNTP and requested a meeting with the Tribes within five days. SER-89. On November 14, 2023, Interior hosted a virtual meeting with the disputing parties and ACHP. SER-89.

On November 24, 2023, the BLM Director sent a letter responding to the Tribes. SER-37–43. The letter explained that despite Interior's extensive efforts over many years to elicit information relating to potential historic properties within the Project's area of potential effects, Interior "did not receive sufficient details through consultation or otherwise about the San Pedro Valley to previously consider the Valley, or resources within it, a TCP." SER-37–38. The letter once again explained that Interior "does not have the ability to reconsider the 2015 approval of the transmission line, especially for a segment of the transmission line that is on non-federal land." SER-38. Interior explained that "avoidance, or even a re-route as contemplated through the Programmatic Agreement is limited to minor adjustments to the

design or construction location, not a complete re-route of a 50-mile segment of the 500-mile plus transmission line." SER-41.

The letter explained that at no point to that date during the § 106 process or during the multi-year effort after the ROD and implementation of the Programmatic Agreement did the Tribes provide Interior with even a request that the San Pedro Valley be considered a TCP, much less sufficient evidence to support that conclusion. SER-39. The agency nonetheless stated that, even though the identification process prescribed by the Programmatic Agreement had concluded, it "genuinely seeks to appropriately mitigate any impacts to a potential TCP," and asked to continue to consult with the Tribes to "evaluate San Pedro Valley and identify appropriate measures to address any adverse effects." SER-41. Interior also stated that it "would be willing to assume the San Pedro Valley is a TCP in order to immediately begin to discuss mitigation," and provided examples of potential mitigation measures. SER-41–42.

On November 27, 2023, Interior notified Tribal leaders that it would lift the suspension of the LNTP. SER-90. In December 2023 and January 2024, prior to Plaintiffs' lawsuit, Interior met with the Tribes

and ASW to discuss possible mitigation measures, although the Tribes and ASW established that their goal is to reroute the transmission line. SER-90–92.

### D. Plaintiffs' complaint

In January 2024, Plaintiffs filed this lawsuit challenging Interior's approval of the Project under the NHPA and the APA. ER-34. The complaint challenged Interior's purported NHPA violations "in granting the right-of-way and authorizing construction on the Project." ER-91. In their complaint, Plaintiffs asked that the court declare that Interior violated the NHPA and the APA in issuing its LNTPs for the San Pedro Valley and requested that the court vacate "the September 27, 2023 and November 27, 2023 LNTPs *and underlying right-of-way authorization* for the Project in the middle and lower San Pedro Valley." ER-93–94 (emphasis added).

To support their claim in the complaint, Plaintiffs laid out their account of the § 106 consultation process. Plaintiffs alleged that Interior completed a Class I and Class II inventory for the Project area, designed to "identif[y] known cultural resource sites" in the Project area and to survey areas where cultural resources were likely to occur,

especially spots where the Project would cross rivers and historic trails. ER-54. Plaintiffs acknowledged that Interior "did not identify the San Pedro Valley" as a TCP in those surveys. ER-54.

The complaint explained that Plaintiffs participated in the § 106 consultation process and alleged that Plaintiffs mentioned the San Pedro Valley in their comments about the Project. ER-55–57; ER-59. But the complaint did not make any factual allegations that Plaintiffs asserted that the San Pedro Valley was a TCP before 2023. Nor did it allege that Plaintiffs provided the kind of information that would be necessary to determine that the San Pedro Valley met the criteria for eligibility in the National Register of Historic Places and was thus eligible to be a TCP. For instance, the complaint alleged that Plaintiff ASW urged Interior to identify cultural properties in the San Pedro Valley because of the large number of archaeological sites in the Valley and explained that "the preferred Project route in the lower San Pedro Valley 'could significantly impact a landscape of significance to Native American groups.'" ER-56–57. The complaint also alleged that the San Carlos Apache Tribe told Interior that the proposed Project route would "cross though the heartland of the Western Apache homeland" and

"have the potential of impacting culturally sensitive and sacred areas of significance and importance to the Tribe and the Tribe's members." ER-59. But the complaint did not allege that the Plaintiffs provided Interior with any information that the entire San Pedro Valley was a TCP, or the specific information required to make that conclusion, such as the precise size, location, or nature of the TCP.

The complaint acknowledged that the Plaintiffs were provided with a copy of the Class III inventory report and were given an opportunity to provide "written comments concerning properties of traditional cultural or religious importance that were not identified in the report." ER-66. The complaint also noted that the inventory report "did not identify the San Pedro Valley" as a TCP. ER-67. But the complaint did not allege that Plaintiffs commented on the inventory report explaining that they believed the San Pedro Valley was a TCP or providing specific information about the purported TCP. *See* ER-66–67. Nor did the complaint allege that Interior failed to comply with any specific term in the Programmatic Agreement.

### E. The district court's denial of Plaintiffs' motion for a preliminary injunction and this Court's denial of an injunction pending appeal

Plaintiffs moved for a preliminary injunction in district court, which the district court denied on April 16, 2024. ER-10. The court found that Plaintiffs were unlikely to succeed on the merits of their claims because (1) Plaintiffs' challenge to the selection of the Project route is time-barred by the statute of limitations and (2) Interior complied with its NHPA obligations in the Programmatic Agreement. ER-18, 23.

With respect to its conclusion that Plaintiffs' challenge to the Project route is time-barred, the district court found that the 2015 ROD constituted final agency action with respect to the determination of the final Project route, and that, under the statute of limitations, 28 U.S.C. § 2401(a), Plaintiffs had six years to challenge the 2015 selection of the final route or the § 106 consultation process leading to the selection of the final route. ER-18–19. The court rejected Plaintiffs' argument that the Programmatic Agreement contemplated the selection of alternative routes because the 2015 ROD set the final route and the Programmatic Agreement only provided for avoidance measures including

"realignment" of the transmission line, which the district court determined meant "slight modifications to the Project route," not "the selection of an entirely new route." ER-20–21. The court also found that the 2023 LNTPs did not provide a backdoor to challenge the Project route, which was set by the 2015 ROD, but instead "simply indicated that all pre-construction conditions were met." ER-22.

With respect to any claim that Interior had violated its ongoing § 106 obligations, the district court first held that the Programmatic Agreement governed Interior's § 106 compliance, and then found that Interior "(1) complied with its obligation to identify historic properties, (2) considered measures to avoid adverse impacts to historic properties, and (3) consulted with Plaintiff Tribes during each phase of the [Programmatic Agreement]." ER-23. The district court emphasized that Interior had provided Plaintiffs with a draft cultural resources inventory report and asked them for comments on whether there were "any properties of traditional cultural or religious importance to tribes and ethnic groups that were not identified in the inventory" and noted that Plaintiffs did not assert that there were any unidentified TCPs in their comments. ER-24–25.

Plaintiffs appealed the denial of their preliminary injunction and moved for an injunction pending appeal in this Court. On May 13, 2024, this Court denied Plaintiffs' motion. SER-94. Shortly thereafter, Plaintiffs dismissed their interlocutory appeal. SER-95–98.

### F. The district court's dismissal

On June 6, 2024, the district court granted SunZia's and Interior's motions to dismiss. ER-3. The district court explained that the complaint asked the court to vacate the 2023 LNTPs "and underlying right-of-way authorization" and found that "Plaintiffs fail to state a claim because their challenges are to the 2015 ROD and are untimely." ER-6. The court also found that the LNTPs, in and of themselves, "do not constitute final agency actions and are not subject to judicial review." ER-6. With respect to any potential claim that Interior has failed to comply with its ongoing obligations under the Programmatic Agreement, the court held that, for the reasons expressed in its denial of Plaintiffs' motion for a preliminary injunction, Plaintiffs had not plausibly alleged that Interior failed to comply with the Programmatic Agreement. ER-7.

The court dismissed Plaintiffs' claim without leave to amend because it found that the dispositive facts were undisputed and that Plaintiffs could not cure the defects in their complaint through amendment. ER-8. Plaintiffs appealed. ER-178.

## SUMMARY OF ARGUMENT

1. Plaintiffs are time-barred from challenging the 2015 ROD, the terms of the Programmatic Agreement, or the Project route. Although Plaintiffs now argue that they are not challenging the Project route, their complaint seeks vacatur of the underlying authorization for the Project. Those claims are plainly barred by the six-year statute of limitations under 28 U.S.C. § 2401(a), because the final Project route was approved and authorized in January 2015, more than eight years before Plaintiffs filed suit.

Under the APA, a claim accrues when a plaintiff is injured by final agency action, and a plaintiff must file suit within six years of when the claim first accrues. Plaintiffs were first injured and first had a right to assert their claim in court in January 2015, when the final ROD set the final Project route through the San Pedro Valley and adopted the Programmatic Agreement to govern Interior's ongoing NHPA

compliance. The ROD explains that it is Interior's "final decision" and that "a right-of-way will be granted to SunZia . . . following the route of the BLM selected Alternative . . . as shown in Figure 1." Plaintiffs' claims challenging the route are now time-barred by the six-year statute of limitations.

Indeed, Plaintiffs now appear to concede that they may not challenge the 2015 ROD, the terms of the Programmatic Agreement, or the Project route. Pls' Br. 39 ("Plaintiffs do *not* seek 'relocation of the project route.'" (emphasis in original)). Instead, Plaintiffs' appellate brief attempts to modify their complaint and argue that they are not challenging the underlying Project route or Project authorization but are instead challenging Interior's ongoing compliance with the Programmatic Agreement and its NHPA obligations. For the reasons discussed below, that claim also fails. But, at the very least, the statute of limitations bars Plaintiffs' challenge to the 2015 ROD, the terms of the Programmatic Agreement, and the Project route.

2. Although a claim based on an ongoing NHPA violation would be timely, Plaintiffs have not plausibly alleged that Interior has violated its ongoing NHPA obligations.

First, Interior's ongoing NHPA obligations are governed by the terms of the Programmatic Agreement, and Plaintiffs have not pleaded facts to support a plausible allegation that Interior has breached any term of the Programmatic Agreement. The Programmatic Agreement lays out the process whereby Interior identifies historic properties (including TCPs), Plaintiffs comment on the draft inventory of historic properties, and Interior and SunZia mitigate effects to historic properties. Plaintiffs argue that Interior did not properly identify the San Pedro Valley as a TCP, but their complaint fails to allege facts explaining which provision of the Programmatic Agreement Interior purportedly violated. On the contrary, the allegations in the complaint show that Interior diligently worked to identify historic properties, consult with Plaintiffs, and mitigate effects to historic properties. Interior specifically asked Plaintiffs for comments on whether there were any unidentified historic properties (including TCPs) during the preparation of the cultural resource inventory, but Plaintiffs never identified the San Pedro Valley as a TCP until 2023, well after the cultural resource inventory and identification process prescribed in the Programmatic Agreement had already been completed.

Second, even if Plaintiffs have pleaded a sufficient factual basis for an ongoing-NHPA-violation claim, they have not identified a legal basis for such a claim. Although Plaintiffs challenge Interior's conduct under § 704 of the APA, that provision requires Plaintiffs to identify a final agency action. Plaintiffs fail to identify a final agency action that they can challenge under the APA. They point to the 2023 LNTPs, but an LNTP is not final because it does not mark the consummation of the agency's decision-making process or carry legal consequences. The LNTP simply informs the applicant that it may begin construction because it has met the conditions in the ROD. Interior's ROD is a final agency action, but Plaintiffs challenged it too late.

3. Finally, the district court did not impermissibly consider evidence when dismissing the complaint. Plaintiffs identify no particular documents that the district court improperly considered that bear on the issues here. In fact, the district court's analysis of the legal issues—including its reliance on the ROD and the Programmatic Agreement —was consistent with Rule 12(b)(6) because, as Plaintiffs agree, those documents are incorporated into the complaint.

Even if the district court erred, any error was harmless. This Court reviews the district court's judgment de novo and may affirm on any ground supported by record, even if the district court relied on the wrong ground or reasoning. Here, the record shows that the complaint fails to state a claim. Even if the district court considered evidence beyond what was appropriate, this Court should affirm the district court's judgment.

## STANDARD OF REVIEW

This Court reviews de novo an order granting a motion to dismiss for lack of subject matter jurisdiction, *Rattlesnake Coal. v. U.S. Envtl. Prot. Agency*, 509 F.3d 1095, 1100 (9th Cir. 2007), or for failure to state a claim, *Palm v. L.A. Dep't of Water & Power*, 889 F.3d 1081, 1085 (9th Cir. 2018).

This Court reviews Plaintiffs' NHPA claim under the standard in the APA. *See Ctr. for Biological Diversity v. Esper*, 958 F.3d 895, 903 (9th Cir. 2020) (citing *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005)). The Court must affirm the district court's dismissal unless Plaintiffs plausibly allege that Interior's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

## ARGUMENT

Plaintiffs now seem to concede that they are not challenging the 2015 ROD, the terms of the Programmatic Agreement, or the Project route, and that any such challenge is time-barred. Pls' Br. 39. Thus, their only remaining possible claim is a claim that Interior violated its ongoing NHPA obligations under the terms of the Programmatic Agreement. But their complaint fails to state a claim for an ongoing violation of the Programmatic Agreement, both because it has not identified a valid legal basis for such a challenge and because it does not include sufficient factual allegations to plausibly allege such a violation. This Court should affirm the district court's judgment dismissing the complaint.

### I. Any challenge to the 2015 ROD, the Programmatic Agreement, or the Project route is time-barred.

Plaintiffs now insist that they "do *not* seek 'relocation of the project route.'" Pls' Br. 39 (emphasis in original). But the complaint challenged Interior's decision to "grant[] the right-of-way and authorize[] construction" and asked the district court to vacate "the

underlying right-of-way authorization" for the Project, an authorization that was granted in the ROD in 2015. ER-91, 94. And in this Court, Plaintiffs' lead substantive argument is that a claim based on the ROD did not accrue until 2023, Pls' Br. 22–26—a strange choice if they truly are not challenging the ROD.

In short, Plaintiffs appear to be conflating two issues: (1) whether a challenge to Interior's *ongoing* compliance with the NHPA is timely (it is); and (2) whether a challenge to the decisions that Interior made and finalized in 2015 is timely (it is not). The district court correctly found that Plaintiffs' challenges to Interior's issuance of the ROD, selection of the Project route, and the § 106 process underlying the selection of the Project route were barred by the six-year statute of limitations. ER-18–22.

### A. Plaintiffs challenged the Project route and sought vacatur of the underlying authorization of the Project.

Although Plaintiffs now argue that they are not challenging the Project route, Pls' Br. 39, that concession must be understood as a departure from how they pursued this case before the agency, before the district court, and now before this Court.

Even before bringing suit, in March 2023, Plaintiffs requested "thorough re-consideration of the alternative routes" for the transmission line. SER-30.

In the district court, the complaint sought vacatur of the underlying authorization for the Project—the 2015 ROD—and alleged that Interior violated the NHPA by granting the right-of-way. ER-91, 94. Both the factual allegations and the requests for relief in the complaint, fairly read, show that Plaintiffs sought to vacate the right-of-way approval and reroute the entire Project out of the San Pedro Valley. That was necessarily a challenge to the 2015 ROD because the ROD set the Project route through the Valley and assured that construction would proceed in the valley. ER-125, 137 (explaining that the ROD is Interior's "final decision," and that "a right-of-way will be granted to SunZia . . . following the route of the BLM selected Alternative . . . as shown in Figure 1"); SER-7 (showing a map of the Project route, including the segment through the San Pedro Valley). Any such challenge to the ROD needed to be brought no later than January 23, 2021.

The complaint is clear that it challenges the Project route through the San Pedro Valley. Plaintiffs alleged that the entire San Pedro Valley is a TCP and that construction in the Valley would irreparably harm their interests in the historic, cultural, and indigenous resources, including TCPs. ER-40, 52. Plaintiffs' allegations about their participation in the administrative process show their consistent opposition to any construction in the San Pedro Valley and goal to reroute the Project. Plaintiffs alleged that ASW told Interior prior to the 2015 ROD that the Project should avoid TCPs all together and that any construction would result in impacts to cultural resources that are "unacceptable under any 'mitigation' scenario," so Interior should drop the proposed Project route from further consideration. ER-57, 58. Plaintiffs alleged that Plaintiff Center for Biological Diversity informed Interior in 2013 that it "share[s] the Tribe's strenuous opposition" to the Project route through the San Pedro Valley and urged Interior to adopt the no-action alternative. ER-62–63.

The complaint alleged that in 2023, after Plaintiffs first identified the entire San Pedro Valley as a TCP, Plaintiff Tohono O'odham Nation wrote a letter to Interior explaining that the agency has ignored

"recommendations to move the Project out of the San Pedro Valley Traditional Cultural landscape" and requesting that Interior resume consultation, "with the goal of moving the proposed Project out of the valley." ER-73 (alterations omitted). Plaintiffs alleged that, after Interior responded to Plaintiffs' new argument that the Valley was a TCP, the agency "flatly refused to reconsider its earlier decision" as to the Project route and instead offered to "assume the San Pedro Valley is a [TCP] in order to immediately begin to discuss mitigation." ER-88. The factual allegations in the complaint thus make plain that Plaintiffs are consistently looking to reroute the Project out of the Valley and refusing to accept any other outcome through consultation.

The legal allegations and request for relief in the complaint also show that Plaintiffs challenged the 2015 ROD and the underlying Project authorization. Plaintiffs alleged that any construction in the San Pedro Valley will "continue to cause serious, adverse effects to historic properties, including [TCPs] and cultural landscapes" and that "grading and road construction will destroy landscape connectivity essential to the religious, historic, and cultural values that the San Pedro Valley embodies for the Tribes." ER-90. Plaintiffs stated that they

challenge Interior's "violations of the NHPA and its implementing regulations in granting the right-of-way and authorizing construction on the Project." ER-91. Although they claim that those actions occurred through the 2023 LNTPs, it was the 2015 ROD that set the Project route and assured that construction would occur in the Valley. After the 2015 ROD set the Project route, including the 50-mile segment through the San Pedro Valley, there was no conceivable right-of-way authorization or LNTP that would not involve construction in the Valley. Finally, Plaintiffs asked the district court to "[d]eclare unlawful, vacate, and set aside the [2023] LNTPs and underlying right-of-way authorization for the Project in the middle and lower San Pedro Valley." ER-94. That request for relief challenges the underlying decision to route the Project through the San Pedro Valley, not merely Interior's ongoing compliance with the Programmatic Agreement.

The entire theory of Plaintiffs' case—that the San Pedro Valley as a whole is a TCP that is incompatible with the transmission line—is necessarily a challenge to the routing decision made in the 2015 ROD. Plaintiffs' opening brief confirms the point. Though Plaintiffs claim they are not challenging the Project route, they also describe the Project as

"a massive transmission line through the heart of the Valley, permanently marring and desecrating this sacred cultural landscape." Pls' Br. 1. Fairly read, Plaintiffs have in substance always challenged the Project route through the San Pedro Valley and have always sought vacatur of the underlying authorization for the Project. But, as explained below, these claims are now time-barred by the six-year statute of limitations because any injury that Plaintiffs suffered occurred when Interior approved the Project route in 2015.

### B. Any challenge to the ROD or the Programmatic Agreement is time-barred because Plaintiffs' injury first occurred in 2015, concurrent with final agency action.

Under 28 U.S.C. § 2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." In *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, the Supreme Court held that a claim "accrues" when "the plaintiff has the right to assert it in court" and that, in the case of the APA, "that is when the plaintiff is injured by final agency action." *Corner Post*, 603 U.S. ___, 144 S. Ct. 2440, 2448 (2024); *see* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

action within the meaning of a relevant statute, is entitled to judicial review thereof."). So if a claim accrues when a plaintiff is injured by final agency action, and a civil suit against the United States must be filed within six years of when the claim first accrues, then Plaintiffs must file suit within six years of when they were *first* injured within the meaning of the NHPA and had a right to assert their claim in court.

But Plaintiffs did not do so here. Any claim challenging the selection of the Project route or the terms of the Programmatic Agreement would have accrued in 2015 when the ROD finalized the Project route and the Programmatic Agreement fixed Interior's NHPA § 106 obligations. The ROD explains that it is Interior's "final decision," ER-125, and that "a right-of-way will be granted to SunZia . . . following the route of the BLM selected Alternative . . . as shown in Figure 1." ER-137; SER-7 (showing a map of the Project route, including the segment through the San Pedro Valley). The ROD also explains that "the [Programmatic Agreement] sets forth the steps for meeting the requirements of [§] 106" and that "[c]ompliance with the procedures in the [Programmatic Agreement] will represent satisfaction of the agency's [§] 106 responsibilities." ER-164. So, to the extent Plaintiffs

challenge the Project route through the San Pedro Valley or the terms of the Programmatic Agreement, those claims accrued in 2015 when the ROD fixed the Project route and the Programmatic Agreement and Plaintiffs were first injured.

Plaintiffs argue that they could not have been injured by the 2015 ROD because the ROD "did not concretely affect Plaintiffs' interests in historic properties" in the San Pedro Valley. Pls' Br. 23. But the ROD set the Project route through the San Pedro Valley and was Interior's "final decision" as to the route. ER-125, 137. If Plaintiffs believed that the San Pedro Valley was a TCP and that any construction in the Valley would impair their historic and cultural interests in the Valley, then they were injured in 2015 when the ROD set the final Project route through the Valley. At that point, they clearly had the "right to file suit and obtain relief." *Corner Post*, 144 S. Ct. at 2450 (internal quotation omitted); *see also* ER-73 (quoting Plaintiff Tohono O'odham's 2023 letter to Interior requesting that Interior "resume consultations with the affected Tribes . . . with the goal of moving the proposed [Project] out of the valley" (alteration in original)); Pls' Br. 30 ("BLM did not consider

the effects of the [right-of-way] on historic properties within the Valley in the initial approval (i.e., the ROD).").

Plaintiffs argue that the Programmatic Agreement allowed Interior to "realign" the Project route, which meant that the final route was not set until construction began. Pls' Br. 34. But, in discussing possible measures to avoid affects to historic properties, the Programmatic Agreement mentions "realignment of the transmission line," not a reroute of an entire 50-mile stretch of the Project route. ER-103. As written in the Programmatic Agreement—and as the district court held—the phrase "realignment of the transmission line" means changing the position of the transmission line "slightly" or making "slight modifications" to the line, not selecting "an entirely new route." ER-21.

Certainly, construction in the San Pedro Valley did not begin until 2023. Pls' Br. 23. And Plaintiffs argue that it was not until construction began that their injuries "crystallized" and their claim accrued. Pls' Br. 24. But *Corner Post* does not require "crystallization" of an injury for a claim to accrue; rather, the claim accrues when "the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to

'file suit and obtain relief.'" *Corner Post*, 144 S. Ct. at 2450 (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)). And the text of § 2401(a) is clear that a suit against the United States must be filed within six years after the right of action *first* accrues. 28 U.S.C. § 2401(a). In *Corner Post*, the Supreme Court held that the plaintiff organization could not file suit and obtain relief at the time the regulation in that case was issued because that organization did not exist at that time. 144 S. Ct. at 2448.

By contrast, when Interior issued the ROD in 2015 and set the final Project route through the San Pedro Valley, Plaintiffs not only existed but had been participating in the administrative process for years. *See supra* at 8–13. Whatever injury they suffered from the selection of a route, they suffered it when Interior issued the ROD establishing the route. Plaintiffs had a "complete and present cause of action" because they had the right to file suit and seek relief if they sought to challenge Interior's final decision for the Project route or the terms of the Programmatic Agreement. *Corner Post*, 144 S. Ct. at 2450 (internal quotations omitted).

The mere fact that other aspects of Project implementation such as the LNTPs were necessary before SunZia could begin construction on certain segments of the transmission line does not mean that Plaintiffs did not have a then-present right of action to challenge the Project route in 2015 when Interior issued the ROD. The ROD clearly contemplates that a party could file suit to obtain relief in 2015 if they challenged the Project route; the ROD states that "any challenge to these decisions [in the ROD], including the . . . issuance of the [right-of-way] grant, as approved by [the] decision, must be brought in Federal District Court." ER-125. Agencies often take final actions approving projects with the caveat that certain conditions must be met before construction commences in the future. *See, e.g.*, 43 C.F.R. § 2807.10 (conditioning the onset of activities under a BLM right-of-way grant on obtaining a written Notice to Proceed in some circumstances); 33 C.F.R. § 148.276 (laying out a process under the Deepwater Port Act in which the relevant agency "issues a Record of Decision (ROD) approving or denying" an application to construct a deepwater port but "[a]ctual issuance of a license [that permits an applicant to proceed with construction] may not take place until certain conditions imposed by the

ROD have been met"). But the ROD approving the Project is the final agency action that gave Plaintiffs a complete and present cause of action and the right to file suit and obtain relief. Any claim challenging the 2015 ROD, the terms of the Programmatic Agreement, or the Project route is time-barred because it was filed in 2024, more than six years after Plaintiffs were first injured. *See* 28 U.S.C. § 2401(a).[5]

Even if this Court accepts Plaintiffs' new formulation that they are only challenging Interior's ongoing compliance with the Programmatic Agreement, Plaintiffs have now conceded that any challenge to the 2015 ROD, the terms of the Programmatic Agreement, or the Project route are time-barred, and Plaintiffs may not resurrect these claims on reply. *See Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 n.1 (9th Cir. 2008) (finding an appellant had forfeited arguments not

---

[5] To the extent Plaintiffs argue that the issuance of the PA violated the NHPA § 106, the allegations in the complaint show that they suffered that injury prior to the ROD when the PA was finalized. ER-58 ("In August 2012, [ASW] submitted comments on the Draft EIS notifying BLM of the agency's failure to comply with the Section 106 process."). If Plaintiffs assert "procedural" NHPA violations with respect to the issuance of the Programmatic Agreement, Pls' Br. 39, then they suffered those injuries before 2015, and the claim accrued when the agency issued the ROD. The claim is thus barred by the statute of limitations. 28 U.S.C. § 2401(a).

specifically argued in a brief); *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are waived.").

## II. The district court correctly dismissed any remaining claim because Plaintiffs have not plausibly alleged that Interior failed to meet its ongoing NHPA obligations.

Because Plaintiffs have conceded that they cannot challenge the 2015 ROD, the terms of the Programmatic Agreement, or the Project route (and even absent that concession, would be time-barred from doing so for the reasons explained above), their only possible remaining claim is their argument that Interior has violated its ongoing § 106 obligations under the Programmatic Agreement. But their complaint fails to state a claim for any ongoing NHPA violation.

As a factual matter, Plaintiffs' well-pleaded allegations fail to plausibly allege that Interior breached any terms in the Programmatic Agreement. As a legal matter, Plaintiffs fail to state a basis for their ongoing NHPA claim because they only bring their claim under 5 U.S.C. § 704 and because the LNTPs were not final agency actions within the meaning of that provision. This Court should affirm the district court's dismissal.

### A. Interior's NHPA obligations are governed by the Programmatic Agreement, and Plaintiffs have not plausibly alleged that Interior has breached any terms in the Programmatic Agreement.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court, and may consider documents that are referred to in the complaint whose authenticity no party questions." *Shwarz v. United States*, 234 F.3d 428, 425 (9th Cir. 2000) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

As an initial matter, Interior's NHPA obligations are governed by the terms of the Programmatic Agreement. When an agency executes a programmatic agreement under the NHPA, it "closes the record" for the purposes of § 106. *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1216 (9th Cir. 2008). The governing regulations identify programmatic

agreements as a lawful means of § 106 compliance. 36 C.F.R. § 800.4(b)(1), (3). An executed programmatic agreement then "govern[s] the undertaking and all of its parts" and compliance with the programmatic agreement satisfies the agency's § 106 responsibilities the undertaking. 54 U.S.C. § 306114; 36 C.F.R. § 800.6(c).[6] Here, the allegations in the complaint show that Interior has complied with the Programmatic Agreement. As the district court found, Interior "(1) complied with its obligation to identify historic properties, (2) considered measures to avoid adverse impacts to historic properties, and (3) consulted with Plaintiff Tribes during each phase" of the Programmatic Agreement. ER-23.

The complaint fails to plausibly allege that Interior violated the terms of the Programmatic Agreement and thus fails to state a claim of an NHPA violation. The Programmatic Agreement lays out the step-by-

---

[6] For this reason, amicus curiae are incorrect when they assert that Interior "delay[ed] completion of its Section 106 process until after issuing" the right-of-way. Amicus Br. 29–30. Entry of the Programmatic Agreement "closed the record" for the purposes of § 106 consultation, and Interior entered the Programmatic Agreement before it issued the ROD setting the Project route in 2015. To the extent that Plaintiffs challenge the terms of the Programmatic Agreement as an inadequate under § 106, their claim accrued in 2015 and is time-barred.

step procedure that governs the process for identifying historic properties—including TCPs—and the circumstances in which Interior may authorize construction considering potential impacts on historic properties. *See* ER-97–101, 107.

Plaintiffs claim that Interior did not properly identify the San Pedro Valley as a TCP but fail to allege in their complaint which provision of the Programmatic Agreement Interior purportedly violated. Instead, Plaintiffs offer only generalized legal conclusions, which are insufficient to state a claim. *See Twombly*, 550 U.S. at 555. In their opening brief, Plaintiffs argue that they make three distinct allegations that are sufficient to state a claim. Pls' Br. 44–46. But none of these allegations plausibly assert that Interior has violated the terms of the Programmatic Agreement.

First, Plaintiffs argue that "the [Programmatic Agreement] requires BLM to consider the 'values expressed by' Tribes when identifying historic properties" and that Interior "repeatedly ignored detailed information alerting [the agency] to a likely TCP in the Valley." Pls' Br. 44. In support of this assertion, Plaintiffs point to two sets of allegations in their complaint: allegations about their comments from

2012, well before the Programmatic Agreement was entered, ER-58–61, and allegations about Plaintiff ASW's comments (not a Tribe's comments) in 2023 that the Project segments in the San Pedro Valley "are integral to a well-documented cultural landscape." ER-69. The allegations from before the Programmatic Agreement was executed are irrelevant to the issue of Interior's ongoing compliance with the Agreement. And the allegations from 2023 fail to allege that Interior has violated the Programmatic Agreement because they ignore the fact that the Agreement sets forth a detailed process to identify and inventory cultural properties. Under the Programmatic Agreement, the draft cultural resource inventory report was prepared and distributed to consulting parties, including the Plaintiffs, for comment. SER-57–58. In their complaint, Plaintiffs themselves recognize that they had the opportunity to provide comments on the inventory report and that the report did not identify the San Pedro Valley as a TCP. ER-66–67. Plaintiffs did not suggest any unidentified TCPs, particularly as it relates to the entire San Pedro Valley being a TCP. SER-57–58; SER-75–76. Thus, under the Programmatic Agreement, the inventory list is then what governed Interior's compliance with the remaining provisions

of the Programmatic Agreement that address evaluation and resolution of adverse effects on historic properties. ER-100–02. To show that Interior violated the Programmatic Agreement in 2023, Plaintiffs would have to allege a specific way that Interior failed to mitigate effects to a historic property that was identified in the inventory list. It is not enough for Plaintiffs to allege that ASW explained in 2023 that the San Pedro Valley was a "well-documented cultural landscape." ER-69.

Plaintiffs argue that Interior never conducted a cultural landscape study to identify TCPs, "as required by the [Programmatic Agreement]." Pls' Br. 12. But there is no term in the Programmatic Agreement that requires Interior to conduct a cultural landscape study. Interior gave Plaintiffs multiple opportunities to flag unidentified cultural resources, and they never raised the idea that the San Pedro Valley is a TCP until 2023.

Second, Plaintiffs argue that the Programmatic Agreement "requires BLM to *consider* avoiding historic properties, including by 'realignment of the transmission line,'" but that Interior "refused to consider measures to avoid likely TCPs in the Valley." Pls' Br. 44–45 (emphasis in original). They also argue that the Programmatic

Agreement precludes Interior from issuing any notice to proceed that will "restrict subsequent measures to avoid, minimize, or mitigate" adverse effects to historic properties and that the 2023 LNTPs authorized construction that "effectively foreclosed consideration" of such measures. Pls' Br. 45. Again, the Programmatic Agreement defines "historic properties" as those identified through the Programmatic Agreement process and listed on the inventory report. ER-102. Plaintiffs have not alleged that the San Pedro Valley was on the inventory report and thus is a "historic property" for the purposes of mitigation measures under the Programmatic Agreement. Thus, Plaintiffs have not alleged that Interior violated any provision of the Programmatic Agreement.

Third, Plaintiffs allege that Interior "authorized activities that 'adversely affected historic properties, including [TCPs] and cultural landscapes, prior to the completion of the . . . consultation process required by the NHPA, its implementing regulations, *and the [PA]*." Pls' Br. 45 (emphasis and alterations in original). Yet again, this allegation fails to state a claim for an NHPA violation because the San Pedro Valley was not identified as a "historic property" in the inventory report

and Plaintiffs never suggested otherwise in their comments on the inventory report. Furthermore, a bare assertion that Interior "authorized activities that adversely affected historic properties," Pls' Br. 45, does not "permit the court to infer more than the mere possibility of misconduct" and thus fails to state a claim. *Iqbal*, 556 U.S. at 679.

Ultimately, all of Plaintiffs' arguments that Interior violated the Programmatic Agreement appear to revolve around the argument that Interior failed to identify the entire San Pedro Valley as a TCP and take steps to avoid any impacts to the Valley. These arguments fail for the reasons discussed, but they also underscore that Plaintiffs—despite their protestations to the contrary—are attempting to make an end-run around the statute of limitations and challenge the route that Interior approved in the 2015 ROD. In any event, Plaintiffs fail to plausibly allege that Interior has violated any specific provision of the Programmatic Agreement, and thus fail to state a claim that Interior has violated its ongoing NHPA obligations.

### B. Plaintiffs have not identified a final agency action to support their arguments about ongoing NHPA compliance.

Even if this Court finds that Plaintiffs have pleaded sufficient factual allegations to plausibly allege that Interior has violated its ongoing NHPA obligations, it should still affirm the district court's dismissal because Plaintiffs have not identified a final agency action on which to base their APA challenge.

Plaintiffs challenge Interior's ongoing NHPA compliance under the APA, which authorizes a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to seek judicial review of that action. 5 U.S.C. § 702. Under the APA, if a specific agency action is not made reviewable by another statute, then litigants must challenge "*final* agency action." 5 U.S.C. § 704 (emphasis added); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004). And a court, under 5 U.S.C. § 706(2) may "hold unlawful and set aside" final agency actions that are arbitrary and capricious. Alternatively, under 5 U.S.C. § 706(1), litigants may challenge an agency's failure to take a discrete action that it is required to take. *Norton*, 542 U.S. at 64.

Plaintiffs here argue that they are challenging the 2023 LNTPs, which they claim constituted Interior's final agency action for its NHPA process. Pls' Br. 34. But they fail to state a claim because, as the district court held, the LNTPs were not "final" agency actions. ER-7–8, 22.

Two conditions must be satisfied for an agency action to be considered "final" within the meaning of 5 U.S.C. § 704: First, the action must "mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). And second, the action "must be one by which rights or obligations have been determined or from which legal consequences will flow." *Id.* at 178 (internal quotations omitted).

An LNTP, as used here, is not final agency action; rather, an LNTP implements the ROD, which is the relevant final agency action. The LNTP simply authorizes construction on a project segment after all preconstruction conditions are met. *See* 43 C.F.R. §§ 2805.10(b)(2), 2805.13, 2807.10; ER-137. It is thus the ROD, not the LNTP, that marks the "consummation of the agency's decisionmaking process" and from which "rights or obligations have been determined" and "legal consequences flow." *Bennett*, 520 U.S. at 177–78 (internal quotations

omitted). In NHPA parlance, the right-of-way (and related route selection) is the "undertaking" at issue here. *See* 54 U.S.C. § 300320 ("[T]he term 'undertaking' means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency."). The ROD approved that undertaking and adopted certain conditions. Entry of the Programmatic Agreement constituted Interior's § 106 compliance for purposes of the approval. The LNTP simply informs the applicant that it may begin construction because it has met the conditions in the ROD. ER-174.

Plaintiffs argue that the ROD could not have been final agency action with respect to the agency's NHPA obligations because the ROD deferred some NHPA obligations that would be completed prior to Project construction. Pls' Br. 31. But it is the ROD and the Programmatic Agreement that fix Interior's obligations under the NHPA. 36 C.F.R. § 800.14(b)(2)(iii); ER-166–68. The ROD simply conditioned the start of construction on, among other things, completion of the applicable Programmatic Agreement steps. Assuring implementation of the Programmatic Agreement is compliance with the ROD, not a new or different NHPA process separately challengeable. As

explained above, plenty of final agency actions involve an approval subject to certain conditions followed by a period in which the applicant meets those conditions before it is certified to begin construction. Here, the ROD was the final agency action that consummated Interior's decisionmaking process by approving the undertaking and set the ongoing NHPA obligations (and thus determined the rights and obligations under the NHPA). Plaintiffs fail to recognize that using the programmatic-agreement process is not the same as deferring the decision to approve the right-of-way and location of the transmission line until after the ROD. *See* 36 C.F.R. § 800.14.

Plaintiffs argue that the LNTPs were final agency action because, under *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836, 845 (9th Cir. 2007), no case or controversy existed after Interior issued the ROD because the § 106 process was "neither finalized nor ripe for review." Pls' Br. 33, 35. But *Northern Cheyenne Tribe* is inapposite. There, the plaintiffs' NHPA claims were unripe because they challenged a decision that was "not the final approval of any specific . . . activities" and because the plaintiffs were free to bring future actions challenging site-specific decisions, which would have involved additional environmental

analysis and a new final decision. 503 F.3d 836, 845 (9th Cir. 2007). Here, the ROD has always been the final approval of the project and the NHPA undertaking.

Plaintiffs' reliance on *California Sea Urchin Commission v. Bean*, 828 F.3d 1046 (9th Cir. 2016), and *Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Engineers*, 683 F.3d 1155, 1159 (9th Cir. 2012), is similarly misplaced. In *California Sea Urchin Commission*, this Court held that both a rulemaking granting the authority to terminate a program at some indefinite point in the future and the actual agency action terminating that program were final agency actions. 828 F.3d at 1049. But here, the 2015 ROD did not espouse some indefinite, discretionary authority to take a future action. Rather, it plainly established the Project route and the terms and conditions that would be required before construction could proceed. In *Snoqualmie Valley*, this Court held that a claim could not have been brought during a prior case because it was unclear at that point whether a project would have to apply for an additional permit before proceeding. 683 F.3d at 1159. But here, it has always been clear that the ROD

approving the undertaking was the final agency action that was subject to judicial review if the Plaintiffs sought to challenge the Project route.

According to Plaintiffs, even if the ROD was Interior's final agency action, they still are not time-barred from asserting their claim because "[t]he injury to Plaintiffs' concrete interests in historic properties in the Valley occurred only once BLM conclusively determined that construction could proceed in the Valley." Pls' Br. 24. Plaintiffs argue that, before SunZia actually began construction in the valley, their concrete interests could not have been injured because "they did not know whether (and to what extent) BLM would work to identify historic properties" and to resolve the Project's effects on those properties. *Id.*

But this argument is based on the flawed premise that Interior could reroute the Project out of the Valley after the 2015 ROD. Such a premise would require the court to completely ignore Interior's stated purpose in issuing the 2015 ROD—to authorize a right-of-way for the Project and set the route. "A right of action 'accrues' when the plaintiff has a 'complete and present cause of action'—i.e., when she has the right to 'file suit and obtain relief.'" *Corner Post*, 144 S. Ct. at 2450 (quoting *Green*, 578 U.S. at 554). If the injury to Plaintiffs' concrete

interests in the Valley occurred once Interior "determined that construction could proceed in the Valley," Pls' Br. 24, and if Plaintiffs concede that the 2015 ROD was the final decision approving the Project route through the Valley, *see* ER-137, then Plaintiffs' claim accrued in 2015 because, at that point, they first "ha[d] the right to file suit and obtain relief." *Corner Post*, 144 S. Ct. at 2450 (internal quotations omitted).

The complaint is explicit that its challenge to Interior's ongoing NHPA compliance is an APA challenge. ER-35 (alleging that "BLM's decision to issue the LNTPs" violates "5 U.S.C. § 706(2)"). And Plaintiffs have consistently argued that the LNTPs are a final agency action that they can challenge under the APA. *See* Pls' Br. 26–43. Because the LNTPs were not final agency actions challengeable under the APA and because the injury to Plaintiffs' interests in the Valley occurred when Interior issued the 2015 ROD, Plaintiffs have failed to state a claim for an ongoing NHPA obligation, and this Court should affirm the district court's dismissal.

## III. The district court did not err in relying on documents beyond the complaint, and any error by the district court is irrelevant because this Court's review is de novo.

Plaintiffs argue that the district court's judgment must be reversed because the district court erred by relying on the preliminary injunction record when deciding the motion to dismiss. Pls' Br. 20–22. But Plaintiffs have not shown that the district court erred and, even if the district court did rely on documents outside of the complaint, any error was harmless.

Plaintiffs do not point to any particular documents that the district court improperly relied on in dismissing their claim, nor do they squarely argue that the district court relied on any documents outside of the complaint and documents incorporated into the complaint. *See* Pls' Br. 20 ("[T]o the extent the district court's ruling on the motions to dismiss relied upon the preliminary injunction record and any factual findings made on the basis of that evidence, such reliance was inappropriate.").

In fact, as explained above, the record clearly supports the district court's dismissal. Plaintiffs' challenge to the 2015 ROD or the Project route is time-barred, and Plaintiffs have not alleged that Interior

violated any ongoing NHPA obligation because they have not pointed to any term in the Programmatic Agreement that Interior allegedly violated. All of this is clear from the complaint, the ROD, and the Programmatic Agreement. Plaintiffs agree that the ROD and the Programmatic Agreement are documents incorporated into the complaint and thus appropriate to consider at this stage. Pls' Br. 20 n.10; *see also, e.g., United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Because Plaintiffs have not pointed to any particular documents that the district court improperly considered that bear on these issues, they have not shown that the district court erred by dismissing the complaint. The district court's actual analysis of the legal issues—including its reliance on the ROD and the Programmatic Agreement—was consistent with Rule 12(b)(6). Any inexact language it employed was of no consequence.

Even if the district court erred by relying on the preliminary-injunction record when deciding the motion to dismiss, that error does not compel reversal. This Court reviews de novo the district court's decision to grant a Rule 12(b)(6) motion for failure to state a claim. *Ariz. All. for Cmty. Health Ctrs. v. Ariz. Health Care Cost Containment Sys.*,

47 F.4th 992, 998 (9th Cir. 2022). In applying de novo review, the Court may "affirm the district court's judgment on any ground finding support in the record, even if it relied on the wrong ground or reasoning." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). As outlined above in Part II, the record shows that the complaint fails to state a claim. Regardless of whether the district court considered evidence beyond what was appropriate, this Court should affirm the district court's judgment dismissing the complaint.

Likewise, the record shows that it was appropriate for the district court to dismiss the complaint without leave to amend. Dismissal without leave to amend is proper if "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). Plaintiffs argue that any defects in their complaint "can easily be remedied by granting Plaintiffs leave to amend their pleading." Pls' Br. 47. But as discussed in Parts I and II.B, Plaintiffs fail to identify a legal basis for their claim, and thus their pleading could not possibly be cured by the allegation of more facts.

## CONCLUSION

For these reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

/s/ *Ezekiel A. Peterson*
TODD KIM
*Assistant Attorney General*

ANDREW M. BERNIE
AMBER DUTTON-BYNUM
DEVON LEHMAN MCCUNE
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

Of Counsel:

MICHAEL SMITH
BENJAMIN VACCARO
*Attorneys*
Office of the Solicitor
U.S. Department of the Interior

September 20, 2024
90-1-4-17466

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-3659

I am the attorney or self-represented party.

**This brief contains 11,789 words,** including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties;
- [ ] a party or parties are filing a single brief in response to multiple briefs; or
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Ezekiel A. Peterson

**Date** September 20, 2024

# ADDENDUM

5 U.S.C. § 706 .................................................................................. 2a

28 U.S.C. § 2401 .............................................................................. 3a

54 U.S.C. § 306108 .......................................................................... 4a

36 C.F.R. § 800.4 ............................................................................ 5a

36 C.F.R. § 800.14 .......................................................................... 6a

36 C.F.R. § 800.16 .......................................................................... 8a

## 5 U.S.C. § 706

*Scope of Review*

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

* * *

## 28 U.S.C. § 2401

*Time for commencing action against United States*

(a) Except as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

* * *

## 54 U.S.C. § 306108

*Effect of undertaking on historic property*

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

**36 C.F.R. § 800.4**

*Identification of historic properties.*

* * *

(b) Identify historic properties. Based on the information gathered under paragraph (a) of this section, and in consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that might attach religious and cultural significance to properties within the area of potential effects, the agency official shall take the steps necessary to identify historic properties within the area of potential effects.

* * *

(2) Phased identification and evaluation. Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process to conduct identification and evaluation efforts. The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to § 800.6, a programmatic agreement executed pursuant to § 800.14(b), or the documents used by an agency official to comply with the National Environmental Policy Act pursuant to § 800.8. The process should establish the likely presence of historic properties within the area of potential effects for each alternative or inaccessible area through background research, consultation and an appropriate level of field investigation, taking into account the number of alternatives under consideration, the magnitude of the undertaking and its likely effects, and the views of the SHPO/THPO and any other consulting parties. As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section.

**36 C.F.R. § 800.14**

*Federal agency program alternatives.*

* * *

(b) Programmatic agreements. The Council and the agency official may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings.

* * *

(2) Developing programmatic agreements for agency programs.

* * *

(iii) Effect. The programmatic agreement shall take effect when executed by the Council, the agency official and the appropriate SHPOs/THPOs when the programmatic agreement concerns a specific region or the president of NCSHPO when NCSHPO has participated in the consultation. A programmatic agreement shall take effect on tribal lands only when the THPO, Indian tribe, or a designated representative of the tribe is a signatory to the agreement. Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement until it expires or is terminated by the agency, the president of NCSHPO when a signatory, or the Council. Termination by an individual SHPO/THPO shall only terminate the application of a regional programmatic agreement within the jurisdiction of the SHPO/THPO. If a THPO assumes the responsibilities of a SHPO pursuant to section 101(d)(2) of the act and the SHPO is signatory to programmatic agreement, the THPO assumes the role of a signatory, including the right to

terminate a regional programmatic agreement on lands under the jurisdiction of the tribe.

(iv) Notice. The agency official shall notify the parties with which it has consulted that a programmatic agreement has been executed under paragraph (b) of this section, provide appropriate public notice before it takes effect, and make any internal agency procedures implementing the agreement readily available to the Council, SHPO/THPOs, and the public.

* * *

## 36 C.F.R. § 800.16

*Definitions.*

* * *

(l)(1) Historic property means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria.

* * *

(t) Programmatic agreement means a document that records the terms and conditions agreed upon to resolve the potential adverse effects of a Federal agency program, complex undertaking or other situations in accordance with § 800.14(b).

* * *